*Claudia Maria Figueroa De Landaverde, et al. v. Santiago Navarro, et al. and Elizabeth Gomez, et al. v. Parrish Services, Inc., et al.*, **Nos. 1719 and 2089, September 2016 Term**

HVAC mechanics were sent to a home by the insurer of that home to repair a hot water heater and a boiler. While at the home, the mechanics [allegedly] saw a flue pipe that was defective, but did not either fix it or warn the homeowner that the defective flue pipe created a danger in that residents of the home might be poisoned by carbon monoxide gas. Even though the mechanics fixed the immediate problem that caused the boiler and hot water heater to malfunction, the mechanics had a duty to the homeowner and to persons who lived in the house to either fix the flue pipe or warn of the danger it presented (even though no contractual privity existed) if: 1) it was foreseeable that occupants of the home would be at risk of death or serious bodily harm should the defect in the flue pipe not be repaired; and 2) the mechanics worked in a profession that required them to know of the risks and dangers of carbon monoxide poisoning when a defective flue pipe existed.

Circuit Court for Prince George's County
Consolidated Case Nos. CAL14-29078, 15-08622, 15-08623, 15-08624, and 15-08625

Pursuant to Maryland Uniform Electronic Legal Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Bessie Decker, Clerk
April 20, 2018

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

Nos. 1719 and 2089
September Term, 2016

_____

CONSOLIDATED CASES

_____

No. 1719
CLAUDIA MARIA FIGUEROA DE
LANDAVERDE, ET AL.

v.

SANTIAGO NAVARRO, ET AL.

_____

No. 2089
ELIZABETH GOMEZ, ET AL.

v.

PARRISH SERVICES, INC., ET AL.

_____

Graeff,
Leahy,
Salmon, James P.
   (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Salmon, J.

_____

Filed:  July 26, 2018

On the evening of April 23-24, 2012, five people were residing at a house located at 722 Shelby Drive, Oxon Hill, Maryland. All five died that evening of carbon monoxide poisoning. The cause of that poisoning was that some unknown person or persons had negligently connected the home's bathroom ventilation fan to the flue that was supposed to carry carbon monoxide gas from the boiler and water heater up through the ceiling and through the roof. On the evening in question, someone evidently left the bathroom fan on, and later that evening, due to the improper fan connection, carbon monoxide gas backed up and entered the rooms occupied by the victims. Those victims were: Sonia Chavez, Oscar Chavez, Nora Leiva, Francisco Gomez, and Nelson Landaverde.

The decedents' spouses and children filed in the Circuit Court for Prince George's County complaints for negligence and wrongful death against Homesure Services, Inc. ("Homesure"), Safeguard Properties, LLC ("Safeguard"), Caviness Mechanical Services ("Caviness"), and Parrish Services Inc. ("Parrish"). In addition, the spouses and children of Landaverde and Gomez filed actions against Santiago Navarro, one of the owners of the house where the carbon monoxide poisoning occurred. Subsequently, the claims against Homesure and Safeguard were dismissed without prejudice.

Navarro, Caviness, and Parrish filed motions for summary judgment. After a hearing on October 3, 2016, the circuit court denied Navarro's motion for summary judgment and granted summary judgment in favor of Caviness and Parrish. Subsequently, pursuant to a voluntary stipulation, the actions against Navarro were

dismissed without prejudice.  In these consolidated cases, the spouses and children of the

victims noted timely appeals.

## QUESTIONS PRESENTED

Appellants present two questions for our consideration which we have rephrased,

slightly, and reordered as follows:

> I.  Did the circuit court err in finding that a home warranty contract between a home owner and a warranty company absolved Caviness and Parrish from any tort duty to address rust and holes on the flue pipes of a heating and hot water system at 722 Shelby Drive?

> II. Did the circuit court err in finding that Caviness and Parrish had no tort duty, as a matter of law, to address rust and holes on the flue pipes of the heating and hot water systems they worked on at 722 Shelby Drive?

For the reasons set forth below, we answer both questions in the affirmative and

reverse the judgments entered in favor of Caviness and Parrish.

## FACTUAL BACKGROUND

In February 2010, Sonia Chavez and Santiago Navarro purchased a single family

home located at 722 Shelby Drive in Oxon Hill.[1]  Navarro never lived at 722 Shelby

Drive.  There was evidence that he was a friend of Sonia and Oscar Chavez and had

---

[1]  The home, which was built in 1955, was originally owned by Minnie L. Pleasant. Gardner A. Tilghman testified that he and his wife purchased the home from Ms. Pleasant and lived in the home from approximately 2005 to 2008.  In May 2008, Mr. Tilghman and his wife rented the home to a tenant.  On August 27, 2009, the home was sold to the Starlight Group, LLC, which performed repair and renovation work for the purpose of reselling the property.  The home was thereafter unoccupied until it was purchased by Mrs. Chavez and Mr. Navarro on February 12, 2010.

agreed to purchase the home with Mrs. Chavez because Mr. Chavez had a bad credit history.

Starting in February 2010, Mrs. Chavez and her husband lived in the home and rented rooms to Nelson Landaverde and Francisco Gomez. At the time of the incident giving rise to this case, Mrs. Chavez's sister, Nora Leiva, was also staying in the home.

The decedents' spouses and children filed identical suits against Caviness and Parrish alleging that fatal amounts of carbon monoxide entered the home as the result of an improperly installed bathroom fan that had been spliced into the flue used to vent exhaust from the boiler and hot water heater. The date the fan was installed is unknown.[2]

At the time Mrs. Chavez and Mr. Navarro purchased the home, they entered into a home warranty agreement with Homesure that covered repairs to a number of appliances in the home, including the heating system and hot water heater. The warranty agreement provided that Homesure would "pay the covered costs to repair or replace the items listed as covered . . . if any such items become inoperable during the term of this Agreement due to mechanical failure caused by routine wear and tear, subject to the terms and conditions of this Agreement." The warranty agreement covered the mechanical components of one primary central heating system, but did not cover "[c]himneys, flues, and liners[.]" The agreement also covered the mechanical parts and components of one

---

[2] In their depositions, both Mr. Tilghman and Maximillian Antonio Ramos Mejia, who performed renovation work on the home when it was owned by the Starlight Group, LLC, stated that there was no vent fan in the bathroom when they lived in or worked on the home. If that testimony was believed, this meant that the vent fan was installed sometime after February 12, 2010 when Mrs. Chavez and Mr. Navarro purchased the home.

water heater, but did not include "flues; vent pipes/lines[.]" If a claim was covered, Homesure agreed to provide Mrs. Chavez "with a referral to an independent contractor," whom Homesure had the "sole authority" to select.

The relationship between Caviness and Parrish and the warranty company, Homesure, was governed by a service provider's agreement pursuant to which Caviness and Parrish agreed to collect deductibles and excess fees from customers and to bill Homesure directly at pre-negotiated discounted rates.[3] All parties agreed that Caviness and Parrish were independent contractors.

On March 1, 2010, Mrs. Chavez contacted Homesure and reported that the heating system was not working properly. Homesure arranged for Caviness to respond to Mrs. Chavez's complaint. On March 2, 2010, Caviness employee, Darren Baine, went to the home, determined that there was a defective pilot control module on the boiler, and the next day, replaced it.

A few months later, on June 3, 2010, Mrs. Chavez contacted Homesure to report that the hot water heater was not working properly. On this occasion, Homesure arranged for Parrish to respond to Mrs. Chavez's complaint.

---

[3] The service provider's agreement and application referenced by the parties was for Cross Country Home Services, a subsidiary of Homesure, Inc., but the parties agreed that, for purposes of this case, it was the same service provider's agreement that Caviness and Parrish had with Homesure.

4

On June 4, 2010, Parrish employee, Robert Rhoades, went to the home, determined that the pilot light would not stay lit, and ordered a replacement gas control valve. He returned to the home on June 10, 2010 and installed the new valve.

The motions court was provided with a picture, taken by a home inspector in 2008, that appellants claim shows rust on the flue pipe from which the heater and boiler vented.

The appellants claimed that the service technicians from Caviness and Parrish should have discovered that there were holes and rust on the flue through which the exhaust from both the boiler and hot water heater vented, warned the occupants of the home that carbon monoxide poisoning could occur if the flue was structurally compromised as a result of the rust and holes, and fixed the damaged flue pipe. They also claimed that the service technicians from Caviness and Parrish should have investigated the cause of the rust-damaged flue pipe or informed the occupants of the home that the boiler and hot water heater were not safe to use until such investigation was performed. Further, they asserted that a competent investigation into the cause of the rust-damaged flue pipe would have revealed the life-threatening connection between the bathroom ventilation fan exhaust and the flue for the boiler and hot water heater.[4]

---

[4] In the circuit court, there was a material issue of fact presented as to whether, at the time when agents of Parrish and Caviness visited 722 Shelby Drive, the negligent connection between the ventilation fan to the flue existed. According to the appellees, they had evidence that the fan in question was not manufactured until October, 2010, which was several months after appellees' agents made the repairs. Appellants apparently have evidence that, if believed, would show that the faulty hook-up of the fan existed when appellees' agents made their inspections.

Darren Baine, the service technician from Caviness who performed service on the heating system at 722 Shelby Drive, in the early part of March 2010, died in September 2011. The only document pertaining to the work he performed was an invoice.

Caviness's corporate representative and owner, David Caviness, testified in a deposition that all of his company's work in 2010 was obtained through home warranty companies including, but not limited to, Homesure. He explained that typically there was an established price limit for repairs and Caviness could perform any work with a cost under that limit while more expensive work required pre-authorization from the warranty company. Mr. Caviness stated that his company's employees were never instructed not to look for problems with flue pipes even though flue pipes were never covered by any of the home warranty companies for whom his company worked. On that point, he gave the following deposition testimony:

> [Mr. Caviness]: That's how you make your money. Go in and look for a problem, especially a problem that's not covered, that's when you make your money with the warranty company. Try to find as many problems as you can that's lack of maintenance, something that's not covered under the contract. That's the only way you make money with the warranty companies. Now, it's between you and your – your – the homeowner.
>
> [Plaintiffs' Counsel]: If I understand correctly, the only – you're saying the only way you make money is, essentially, by billing somebody, other than the home warranty company?
>
> [Mr. Caviness]: Right.
>
> [Plaintiffs' Counsel]: Okay.
>
> [Mr. Caviness]: Basically, the home warranty companies, they give them out when they – people buy the house and you're hoping to God that they break away from the warranty company and they – they use your services afterwards, you know. But some people are lifetime warranty people and,

6

you know, when you go into jobs with the Homesure, they didn't cover maintenance issues, improper installations. They didn't cover none of that, flue pipes.

And then, if you go in and you see a problem, bam, now you got – hey, get right on the phone. Look, you need this, this, this. And then the warranty company will say, well, this is not covered, we'll give the homeowner a call, let them know this is – well, how much is your COD estimate. Give them a price, they call.

Then after they take care of that, you call the warranty company – or the customer and say, hey, look, we can come out and do the job, so ….

Mr. Caviness acknowledged that neither his company nor his employees were employees of Homesure and that the warranty company did not give directions or guidance about specific jobs or control the manner in which the Caviness service technicians performed their work. Mr. Caviness never discussed with the late Mr. Baine the service that was provided at 722 Shelby Drive.

Caviness testified that his company did not provide any special training for its service technicians, but he acknowledged that any required flue work below the ceiling level would be something that Caviness employees would be expected to address. Mr. Caviness was not familiar with any industry standard that would require him to inspect an entire flue above the ceiling and denied that Caviness was required to inspect above the ceiling at 722 Shelby Drive. Mr. Caviness admitted that, if a flue pipe leading from a furnace had rust or corrosion on it, a Caviness employee would be expected to shut down the furnace. The following exchange between plaintiffs' counsel and Mr. Caviness is relevant:

7

Q. Did – did Caviness, at the time in 2010, have any kind of checklist or procedures that its technicians were supposed to follow when figuring out what the problem was – was with a furnace like this one?

[Mr. Caviness]: No. Not with a service tech that's well trained. You know what your procedures are. You know what your obligations are.

Q. I guess I understand that you're – you're basically relying on the tech to exercise his kind of –

A. Yeah.

Q. – professional judgment. Caviness wasn't providing any special training policies, procedures, regarding what its employees should do?

A. No. Every tech – every tech – every, you know, when I've worked for people, I've never had any, you know, you go in and you know what you're doing, you're licensed and you know what you're checking. You know the piece of equipment you're working on and, you know, you're checking your safeties, your flues, it's typical with anybody in this trade.

Q. If the flues connected to the furnace showed signs of rust or corrosion, what would a Caviness employee have been expected to do?

\* \* \*

A. Hypothetical, refer them to a chimney company to have their chimney checked.

Q. Okay. And why would they do that?

[Defense Counsel]: Objection.

[Mr. Caviness]: What?

Q. Why would they do that?

A. Just, I mean, if you get water coming down your chimney because your caps come off, you get a lot of acetic acid because the flue product's mixing with – with your – with water, very acidic. It will eat your, you know, just eat the pipes up.

\* \* \*

8

Q. My question was in 2010, if a Caviness employee saw rust or corrosion on the flue pipe leading from the furnace, what would they be expected to do?

[Defense Counsel]: Objection.

A. We'd shut the furnace down.

Q. Why would you do that?

[Defense Counsel]: Objection.

A. It all depends on – you know, it all depends on the integrity of the pipe. I mean, if you got rust on the outside of the pipe, that don't necessarily mean that the integrity of the pipe's bad or anything. You know, you get water line and water drips. You get condensation in a basement. I mean, its – its – its integrity of the pipe. If the pipe's falling apart, you shut it down.

Robert B. Rhoades, III, the service technician who responded to 722 Shelby Drive on behalf of Parrish, acknowledged that there was no difference in the way he would perform his job if he was working on a home warranty plumbing job or a job for a customer who had called Parrish directly for service. He also acknowledged that as a plumber, he received training about the potential danger to human health that can result from water heaters creating carbon monoxide. Although he had no recollection of his 2010 visit to 722 Shelby Drive, Mr. Rhoades believed, based on his standard practices, that he would have looked at the flue as part of his service of the water heater. At his deposition Mr. Rhoades testified:

[Plaintiff's Counsel]: I want to ask you a couple more questions about the – what we were just really talking about . . . the things you were trained in and kind of your standard practices that you – you would follow in your job. Let me ask you some of these and you tell me if you agree with me or not. If you were to find out that a bathroom fan vent was connected to the

9

flue from a water heater or water boiler, would you understand that that could block the exhaust of carbon monoxide from a house?

[Mr. Rhoades]: Yes.

Q. Okay. Would you agree with me that a corroded or rusted flue attached to the boiler would be a sign of excessive moisture in the flue?

A. Yes.

Q. Okay. Would a possible cause of that kind of excessive moisture be a – let's say, an improperly-connected bathroom fan vent?

[Defense Counsel]: Objection.

[Defense Counsel]: Objection to the form.

[Mr. Rhoades]: Yeah, I guess so.

[Plaintiff's Counsel]: Okay. Have you ever heard of the group called the Air Conditioning Contractors of America?

[Mr. Rhoades]: No.

Q. Okay. Would you agree with me that it is a standard practice among plumbers, like yourself, that when you are called to service a water heater, you should inspect the flue?

A. Do a check-over, yes.

Q. What do you mean by the check-over?

A. It's part of procedure to just check over the –

Q. Oh, I see.

A. – pipe, you know.

Q. Check over the flue?

A. Make sure it's all intact and not full of holes and stuff.

10

Q. Okay. Would you agree with me that if the flue was – had signs of corrosion or rust, that that would be a problem that you would try to address?

A. Correct.

Q. And can you just tell me why is that? Why is it that you would try to correct a corroded or rusted flue?

A. Well, it – if it's rusted up and got holes in it, then, obviously, it would be a problem.

\* \* \*

Q. Why would it be a problem?

A. Carbon monoxide.

Q. Okay. Now, when you worked at Parrish, if you saw a rusted or corroded flue, is that something you would put down in your – in your handwritten notes to send back to Parrish?

[Defense Counsel]: Objection to the form. Go ahead.

A. Yes.

Q. And if you observed the corrosion or rust on the flue, is that something you would notify the homeowner about?

A. Correct.

Q. And why would you do that?

A. Because that would be something [sic] need to be fixed.

\* \* \*

Q. Would you also – if you saw a rusted or corroded flue coming from the water heater, would you attempt to find out what the cause of that was?

A. Yes.

11

Mr. Rhoades went on to testify that if he had seen rust or corrosion on the flue pipe in 2010, he would have "recommend[ed] replacing it."

Alan Givens, the Chief Executive Officer and corporate representative of Parrish gave deposition testimony somewhat similar to that of Mr. Rhoades:

> [Plaintiff's Counsel]: And as part of this [ride-along] training, you're – Parrish's employees would be told to look for other problems to potentially fix?
>
> [Mr. Givens]: Correct.
>
> Q. And that would include rusted or corroded flue pipes?
>
> A. Right.
>
> Q. Okay. Touching on something I talked about earlier, was there any kind of verbal instruction [as to work] that that was not to be done on home warranty jobs?
>
> A. No.
>
> Q. Okay. And was it the – in terms of doing this more work and looking – identifying problems, was it Parrish's position when doing these – this ride-along training, that rust and corrosion on these flue pipes was a problem that should be fixed?
>
> [Defense Counsel]: Objection to the form of the question.
>
> A. That would depend on the amount of rust and corrosion that you would see.
>
> [Plaintiff's Counsel]: Okay. So there was a – essentially, a level of rust or corrosion that was tolerable that did not need to be fixed or addressed –
>
> [Defense Counsel]: Objection to the form of the question.
>
> A. Well, yeah, I mean, you could – you could see water stains coming down a piece of flue pipe and that doesn't mean that there's an ongoing problem. That could mean a lot of different things.

12

Q. Okay. So there's some – some tipping point at which the corrosion or rust on a flue pipe becomes an issue that needs to be addressed?

A. Yes.

Q. Okay. Is there any way for you to kind of articulate what that level would be?

A. Well, any clear holes or, you know, if the – if the flue pipe appears to be so rusted that, you know, failure is imminent. You know, a lot of corrosion buildup, you know, because you can – you can get – you can have a thin buildup and you can have a very thick buildup of – of combustion gases that have condensed and started etching the flue pipe.

Q. If there was, let's say – let's say any level of corrosion spotted by a Parrish employee back in 2010, would that be something that the Parrish employee should document?

A. No.

[Defense Counsel]: Objection.

[Plaintiff's Counsel]: So would it only have been something that a Parrish employee should have documented if it reached this kind of threshold you were just telling me about?

A. If it was something they were concerned about.

Q. Okay. So that was kind of left to the plumber's discretion, you know, if the problem is concerning, document it?

A. Yes.

The plaintiffs' expert, Marlon Pujol, testified in his deposition that if an inspection revealed any rust inside the pipe, he would "replace the entire flue pipe." Similarly, Parrish's expert witness, Kenneth McLauchlan, testified that a heating, ventilation, and air conditioning ("HVAC") professional should, among other things, examine the visible

13

portions of the venting system, determine if there is rust, and, if so, determine if the venting system is compromised and needs to be replaced.

Caviness and Parrish filed motions for summary judgment on the ground that they did not have any duty in tort to the decedents. Both defendants argued that they did not enter a contract to inspect the flue, that they did not have a duty to inspect the flue or bathroom ventilation system, that they performed the work they were retained to perform, that flues were specifically excluded from the home warranty agreement, that their repair contract was not an insurance policy or guarantee of work performed by others, and that they did not breach their contracts with Homesure.

After a hearing, the circuit court granted summary judgment in favor of Caviness and Parrish, finding that those defendants did not owe a duty to the decedents "because … there was no breach of contract [in relation] to the actions that they took in this case, and then there's no independent basis for any negligence." The court determined that the home warranty agreement excluded the work that the plaintiffs alleged the employees of Caviness and Parrish should have looked into and completed. The court clarified that determination, stating:

> The Court feels that the contract that existed excluding those areas that it was not supposed to look at when it went out to service the appropriate water heater and heating unit – again, they did the work, there's no breach to that particular work that they did, and I don't think that expands – given the contract, that created a duty for them. Had there been some other evidence in that case, possibly. But that evidence is not in this case.

As to Mr. Navarro, the court denied his motion for summary judgment on the ground that a genuine issue of material fact existed with respect to his status and duty as a

14

landlord. As we have already noted, the actions against Mr. Navarro subsequently were dismissed without prejudice.

## STANDARD OF REVIEW

A circuit court may grant a motion for summary judgment "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). We review a circuit court's decision to grant summary judgment *de novo* and without deference, by independently examining the record to determine whether the parties generated a genuine dispute of material fact and, if not, whether the moving party was entitled to judgment as a matter of law. *Rowhouses*, *Inc. v. Smith*, 446 Md. 611, 630-31 (2016); *Sierra Club v. Dominion Cove Point LNG*, *L.P.*, 216 Md. App. 322, 330 (2014). We consider the record "'in the light most favorable to the non-moving party,'" drawing any reasonable inferences against the moving party. *Rowhouses*, *Inc.*, 446 Md. at 631 (quoting *Hamilton v. Kirson*, 439 Md. 501, 522 (2014)). Moreover, when reviewing the issue of whether the court erred in granting summary judgment, we consider only the grounds for granting summary judgment relied upon by the circuit court. *Gilroy v. SVF Riva Annapolis*, 234 Md. App. 104, 125 (2017).

## DISCUSSION

Appellants contend that the circuit court erred in finding that the home warranty contract absolved Caviness and Parrish from any tort duty to address rust and holes in or on the flue pipes. They also argue that the circuit court erred in finding that Caviness and

15

Parrish had no tort duty, as a matter of law, to address rust or holes in or on the flue pipes. We agree with appellants as to both contentions.

The provisions of the warranty contract between Homesure and Mrs. Chavez, and the service provider agreements between Homesure and Caviness and Parrish had no bearing on the duty that Caviness and Parrish, both independent contractors, owed to the decedents, and did not preclude the existence of an independent tort duty. Taking the evidence presented to the motions court in the light most favorable to appellants, there was a foreseeable risk of personal injury or death if a dangerous condition was ignored; and under such circumstances the service technicians from Caviness and Parrish had a duty to exercise reasonable care in performing their work, which included a duty to inspect the visible portions of the flue for signs of rust and corrosion and, if significant rust or corrosion was found, to either warn the homeowner or take other reasonable steps to protect the occupants of the home from carbon monoxide escaping from the flue.

## I. **First Question Presented**

Mrs. Chavez, Caviness, and Parrish initially came into contact with each other as a result of their respective home warranty and service providers agreements with Homesure. The circuit court determined that those agreements excluded "the work that Plaintiff[s] alleges that the Defendant[s] should have looked at and completed." The court explained "that the contract that existed exclude[d] those areas that [Caviness and Parrish were] not supposed to look at when it went out to service the appropriate water heater and heating unit. . . ." Thus, the court concluded that the agreements absolved Caviness and Parrish from any tort duty to address rust or holes on or in the flue pipes.

16

Appellants contend that nothing in the home warranty agreement or the service provider's agreement limited or excluded the work that Caviness and Parrish, both independent contractors, could do at 722 Shelby Drive. They maintain that the home warranty agreement merely clarified those services that would be paid for by Homesure, and those that would not be paid for, but in no way limited the scope of work or professional duties of Caviness and Parrish.

As we have long recognized, the interpretation of a contract is a question of law that we review *de novo*. *Spacesaver Systems*, *Inc. v. Adam*, 440 Md. 1, 7-8 (2014) (and cases cited therein); *Grimes v. Gouldmann*, 232 Md. App. 230, 235 (2017). Our foremost goal in interpreting a contract is to ascertain and effectuate the intention of the contracting parties. *Hartford Accident & Indem. Co. v. Scarlett Harbor Assocs. Ltd. P'ship*, 109 Md. App. 217, 290-91 (1996), *aff'd*, 346 Md. 122 (1997). "The primary source for determining the intention of the parties is the language of the contract itself." *Id.* at 291 (citations omitted). We "give the words of the contract their ordinary and accepted meaning, looking to the intention of the parties from the instrument as a whole." *Finci v. American Cas. Co.*, 323 Md. 358, 369-70 (1991) (citation omitted). If the contract language is unambiguous and capable of only one meaning, we will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used. *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 234 (2013).

> We employ in Maryland an "objective approach" to contract interpretation, meaning that unless a contract's language is ambiguous, we give effect to that language as written without concern for the subjective intent of the parties at the time of formation. This undertaking requires us

17

to restrict our inquiry to the four corners of the agreement, and ascribe to the contract's language its customary, ordinary, and accepted meaning.

Rather than acquiescing to the parties' subjective intent, we consider the contract from the perspective of a reasonable person standing in the parties' shoes at the time of the contract's formation. Thus, the true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant. The language of a contract is only ambiguous if, when viewed from this reasonable person perspective, that language is susceptible to more than one meaning.

*Ocean Petroleum Co.*, *Inc. v. Yanek*, 416 Md. 74, 86-87 (2010) (quotations and citations omitted).

The service provider's agreement that both Caviness and Parrish entered into with Homesure established a relationship whereby Homesure would select a service provider to perform service for customers covered by a Homesure home warranty agreement. The service provider would contact the home warranty customer, perform repair or replacement work as authorized by Homesure, and bill Homesure directly at a "pre-negotiated discounted rate." Homesure agreed to "pay all or a portion of the claim within the contract limits." The parties acknowledged that the home warranty agreements "may have service limits, caps, and/or deductibles," that Homesure would only pay service providers for "pre-approved amounts," and that service providers would "collect deductibles and excess fees from the customer." If work was performed without authorization from Homesure, the service provider was advised "to obtain written approval from the homeowner" and an agreement to pay for all charges not paid by Homesure. The service providers agreed to give customers "any reduction in fees that [they] advertise[d] to the general public[.]" In addition, service providers were required

18

to "warrant all repair workmanship for at least 90 days" and "[a]ll unit replacement and workmanship . . . for at least one year." Specifically with regard to claims that fell outside the coverage provided under the home warranty agreement, service providers were required to extend the pricing and guarantees it had negotiated with Homesure to the customers and to maintain "product value." The service provider agreement stated that "[u]pselling is permitted (replace vs. repair) but not with a negative point of view."

The service providers agreed to "comply with all applicable laws, ordinances, and regulations of any Federal, State, County, Municipal or other lawful authorities," to hold and maintain valid licenses that may be required to engage in order to provide the services performed, and to maintain at all times insurance coverage as specified in the agreement.

The agreement written by Homesure stated:

> Service Provider shall perform its obligations under this Agreement as an independent contractor, and this Agreement shall not constitute, create, or in any way be interpreted as a joint venture, partnership or business organization of any kind. Neither party to this Agreement, nor their respective employees, officers, director, agents, or owners shall be considered employees or agents of the other party; neither party shall have the power to direct and control the day-to-day activities of the other party, and neither party shall have the authority to bind the other party to any agreement whatsoever.

The home warranty agreement between Homesure and Mrs. Chavez was "intended to provide protection against the cost of repairing certain types of mechanical failures of specific items," including the water heater and the heating system. It obligated Homesure to "pay the covered costs to repair or replace the items listed as covered . . . if any such items become inoperable during the term of this Agreement due to mechanical failure

caused by routine wear and tear, subject to the terms and conditions of this Agreement."

As mentioned earlier, the warranty agreement covered the mechanical components of one primary central heating system and the mechanical parts and components of one water heater, but did not cover, among other things, flues.

Homesure agreed to provide Mrs. Chavez "with a referral to an independent contractor." The home warranty agreement included the following exclusions and limitations:

> 3.    This Agreement covers only repairs and/or replacements due to mechanical failure attributable to ordinary wear and tear. Accordingly, the Agreement does not cover failures, which may result from other causes, such as without limitation: improper installation; lightning strikes; . . . .

> \*        \*        \*

> 11.  This Agreement does not cover ductwork with the sole exception of ductwork that is exposed and readily accessible to service a mechanical failure of a covered air conditioning or heating system or item. This Agreement does not cover: asbestos insulated ductwork; concrete encased or inaccessible ductwork; crushed/collapsed ductwork; ductwork damaged by moisture, water, pests and/or animals; insulation; registers, grills and dampers; underground ductwork. Inaccessible ductwork refers to ductwork that is used in central heating and/or air conditioning systems that is not exposed and cannot readily be accessed for replacement or repair due to design and installation obstacles such as, but not limited to, permanent partitions, chimneys, etc. and ductwork embedded in floors, walls or ceilings.

> \*        \*        \*

> 16.   This Agreement does not cover any mechanical failure when the covered item or system has been repaired, modified, disabled or adjusted in any way which prevents us or our independent contractor(s) from inspecting, diagnosing and/or repairing the mechanical failure.

> 17.    This Agreement does not cover items that have had improper alterations, installations or repairs or improperly modify any system,

appliance or component covered by this Agreement, or damage it in the course of remodeling or repair, we will no longer be obligated to cover such item(s).

18. This Agreement does not cover performance or routine maintenance. You are responsible for performing all routine maintenance and cleaning for all covered items and systems as specified and recommended by the manufacturer. You are also responsible for providing all routine maintenance for all areas in a covered property around covered items and/or systems to ensure that these items and/or systems are able to function properly as specified by the manufacturer.

19. We are not liable for any damages that result from an independent contractor's service, delay in providing service or failure to provide service. We are not liable for any incidental, consequential, special, and/or punitive damages, whether caused by negligence or any other cause, and you agree to waive any and all claims for such damages, arising from, resulting from or related to any independent contractor's service, delay in providing service, or failure to provide service, including, but not limited to, damages, resulting from delays in securing parts and/or labor, the failure of any equipment used by an independent contractor, labor difficulties, and/or the negligent, tortious and/or unlawful acts or omissions of any independent contractor.

Contrary to the circuit court's finding, there is nothing in either the service provider's agreement or the home warranty agreement that limited or controlled in any way the work that Caviness and Parrish could perform. Certainly, there was no provision in either agreement that set forth "areas" that Caviness and Parrish were "not supposed to look at when [they] went out to service" a Homesure customer. The home warranty agreement merely specified what Homesure would and would not pay for.

Caviness and Parrish were independent contractors and the agreements at issue specifically contemplated that the independent contractors might perform work beyond what was covered by the home warranty agreement and set some conditions on such work including, but not limited to, the requirement that a homeowner receive the same

21

rates as those charged to Homesure. Representatives of both Caviness and Parrish admitted that their employees looked for additional work beyond what was covered by the home warranty agreement in an effort to generate more income. Nothing in the agreements, however, controlled or directed either Caviness or Parrish in the performance of its HVAC work. For these reasons, we hold that the trial court erred in its factual determination that Homesure controlled Caviness and Parrish, instructed them in the performance of their HVAC work, and limited the scope of the work they could do.

## II. Second Question Presented

We next consider whether the circuit court erred in finding that Caviness and Parrish had no tort duty, as a matter of law, to address rust and holes on or in the flue pipes.

> "In Maryland, a plaintiff must prove four elements to prevail in a claim of negligence: 1) the defendant owed the plaintiff a duty to conform to a certain standard of care; 2) the defendant breached this duty; 3) actual loss or damage to the plaintiff; and 4) the defendant's breach of the duty proximately caused the loss or damage."

*Davis v. Frostburg Facility Operations*, *LLC*, 457 Md. 275, 293 (2018). In the instant case, we are called upon to determine whether there existed a legal duty, which is a question of law to be decided by the court. *Valentine v. On Target*, *Inc.*, 353 Md. 544, 549 (1999). Thus, we review *de novo* the trial court's determination that Caviness and Parrish did not owe a legal duty to appellants. *Nesbit v. Gov't Employees Ins. Co.*, 382 Md. 65, 72 (2004); *Cash & Carry America*, *Inc. v. Roof Solutions*, *Inc.*, 223 Md. App. 451, 461 (2015).

22

There is no universal test to determine whether a duty exists. *Jacques v. First Nat. Bank of Maryland*, 307 Md. 527, 533 (1986). The requirements of a legal duty depend on the specific facts and circumstances presented. *Washington Metro. Area Transit Auth. v. Seymour*, 387 Md. 217, 224 (2005). Maryland has adopted the characterization of "duty" set forth in *Prosser and Keeton on The Law of Torts* § 53 (5th ed. 1984) as "'an obligation, to which the law will give recognition and effect, to conform to a particular standard of conduct toward another.'" *See Blondell v. Littlepage*, 413 Md. 96, 120 (2010) (quoting W. Page Prosser, et al.). Whether a duty exists "represents a policy question of whether the specific plaintiff is entitled to protection from the acts of the defendant." *Blondell*, 413 Md. at 120 (citation omitted); *Premium of America, LLC v. Sanchez*, 213 Md. App. 91, 108 (2013) (citing *Gourdine v. Crews*, 405 Md. 722, 745 (2008)).

In *Jacques*, the Court of Appeals considered whether a bank that agreed to process a loan application owed to its customer a duty of reasonable care in the processing and determination of that application. In reaching its holding that, under the particular facts of the case, the bank was properly charged with that duty, the Court discussed the process to be used in determining whether a tort duty should be recognized:

> In determining whether a tort duty should be recognized in a particular context, two major considerations are: the nature of the harm likely to result from a failure to exercise due care, and the relationship that exists between the parties. Where the failure to exercise due care creates a risk of economic loss only, courts have generally required an intimate nexus between the parties as a condition to the imposition of tort liability. This intimate nexus is satisfied by contractual privity or its equivalent. By contrast, where the risk created is one of personal injury, no such direct

relationship need be shown, and the principal determinant of duty becomes foreseeability.

307 Md. at 534-35 (footnote and citations omitted).[5]

*Jacques* involved damages that were limited to economic loss, but in reviewing

the development of the law of tort duty, the Court recognized:

> that an inverse correlation exists between the nature of the risk on one hand, and the relationship of the parties on the other. As the magnitude of the risk increases, the requirement of privity is relaxed – thus justifying the imposition of a duty in favor of a large class of persons where the risk is of death or personal injury. Conversely, as the magnitude of the risk decreases, a closer relationship between the parties must be shown to support a tort duty. Therefore, if the risk created by negligent conduct is no greater than one of economic loss, generally no tort duty will be found absent a showing of privity or its equivalent.

*Id.* at 537.

---

[5] In *Jacques*, the Court of Appeals recognized that:

> [a]n increasing number of courts have declined to consider the nature of the risk of harm as a factor in determining the existence of a tort duty, finding no rational basis to distinguish between a risk of personal injury and a risk of economic loss. *See*, *e.g.*, *Cosmopolitan Homes*, *Inc. v. Weller*, 663 P.2d 1041 (Colo. 1983); *Drexel Properties, Inc. v. Bay Colony Club Condominium, Inc.*, 406 So.2d 515 (Fla. 4th Dist. Ct. App. 1981); *Barnes v. Mac Brown and Company*, 264 Ind. 227, 342 N.E.2d 619 (1976); *Juliano v. Gaston*, 187 N.J.Super. 491, 455 A.2d 523 (1982), *cert denied*, 93 N.J. 318, 460 A.2d 709 (1983); *Quail Hollow East Condominium Association v. Donald J. Scholz Co.*, 47 N.C.App. 518, 268 S.E.2d 12, *review denied*, 301 N.C. 527, 273 S.E.2d 254 (1980); *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768 (1980).

*Jacques*, 307 Md. at 534 n.4.

Another factor relevant to the determination of whether a tort duty exists is "the nature of the business of the party upon whom the burden is sought to be imposed." *Id.* at 541. The *Jacques* Court stated:

> The law generally recognizes a tort duty of due care arising from contractual dealings with professionals such as physicians, attorneys, architects, and public accountants. Additionally, we have recognized that in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill.

*Id.* (citing *St. Paul at Chase v. Mfrs. Life Insur.*, 262 Md. 192, 219-20, *cert. denied*, 404 U.S. 857 (1971)).

Shortly after its decision in *Jacques*, the Court of Appeals had occasion to consider whether a negligence claim could be asserted against parties with whom the plaintiffs did not have contractual privity. In *Council of Co-Owners Atlantis Condominium, Inc. v. Whiting-Turner Contracting Co.*, 308 Md. 18 (1986), a condominium owners association alleged that through the negligence of contractors, architects, and developers the utility shafts and related electrical work in the condominium building were not constructed and installed in accordance with the plans and specifications, did not comply with the requirements of the applicable building code, and thereby created a fire hazard that threatened the safety and welfare of the condominium owners and occupants. *Id.* at 22.

The Court held that contractual privity was not an absolute prerequisite to the existence of a tort duty. *Id.* at 32. It determined that the duty of builders and architects to use due care in the design, inspection, and construction of the condominium building

25

"extended to those persons foreseeably subjected to the risk of personal injury created, as here, by a latent and unreasonably dangerous condition resulting from their negligence." *Id.* In reaching that conclusion, the Court commented on the evolution of a general rule of liability where the result of negligence is the creation of a dangerous condition. *Id.* at 27-28. Quoting *Prosser and Keeton on the Law of Torts*, the Court stated:

> "[B]y entering into a contract with A, the defendant may place himself in such a relation toward B that the law will impose upon him an obligation, sounding in tort and not in contract, to act in such a way that B will not be injured. The incidental fact of the existence of the contract with A does not negative the responsibility of the actor when he enters upon a course of affirmative conduct, which may be expected to affect the interests of another person.
>
>        \*        \*        \*
>
> The requirement of privity of contract has been abandoned as a basis for recovery by third parties for physical harm to themselves and tangible things against those who negligently supply, repair, or construct things so as to leave them in an unreasonably dangerous condition."

*Id*. at 27 (quoting *Prosser*, § 93, 667-68) (footnote in *Prosser* omitted in *Whiting-Turner*).

The Court in *Whiting-Turner* continued:

> "It is now the almost universal rule that the contractor is liable to all those who may foreseeably be injured by the structure, not only when he fails to disclose dangerous conditions known to him, *but also when the work is negligently done*. This applies not only to contractors doing original work, but also to those who make repairs, or install parts, as well as supervising architects and engineers. There may be liability for negligent design, as well as for negligent construction."

*Id.* at 27-28 (quoting *Prosser*, § 104A at 723) (emphasis added and footnotes omitted in *Whiting-Turner*).

More recently, in *Cash & Carry America*, *Inc. v. Roof Solutions*, *Inc.*, 223 Md. App. 451 (2015), we considered whether a roofing contractor who performed work on a building owed a duty of care in tort to a third party owner of personal property inside the building. Cash & Carry America, Inc. ("CCA") was a business owned in part by Merle Coe, who was its Chief Executive Officer. *Id.* at 454. Coe owned and lived in a townhouse and stored therein certain property including computers containing proprietary software belonging to CCA. *Id.* Roof Solutions was retained by Coe to replace the roof of the townhome and thereafter hired a subcontractor, Diogo Depaula, to perform the roof replacement work. *Id*. at 455. One evening, while the roof replacement was in progress, the roof of the townhouse caught fire. *Id.* Eventually, it was determined that "flame/heat" from a torch used to heat tar paper had ignited the structural members of the roof. *Id.* Some computers owned by CCA sustained damage from water used by firefighters to extinguish the fire. *Id.* at 455-56. Coe and CCA filed a negligence suit against Depaula for breach of the standard of care in performing the roof replacement work, thereby causing the roof to catch fire. *Id.* at 456. They also alleged that Roof Solutions was vicariously liable for Depaula's negligence. *Id*.

Motions for summary judgment were filed and the trial court was faced with the issue of whether either Roof Solutions or Depaula owed a legal duty of care in tort to CCA. *Id.* at 459-60. Ultimately, the trial court determined that neither Roof Solutions nor Depaula owed a duty to CCA and granted summary judgment in their favor. *Id.* The circuit court found that there was no evidence that the computer equipment was inside the townhouse when the roof replacement work was being done and that Depaula, a

27

subcontractor, did not owe a duty of care in tort to CCA as a third-party owner of personal property inside the townhouse. *Id.* at 460.

On appeal, CCA argued that a contractor or subcontractor who performs repair or replacement work on a structure owes a duty, independent of its contract, to perform the work in accordance with the standard of care so as to protect property inside the structure from harm, including property owned by a person who is not the owner of the structure or a party to the roofing contract. *Id.* at 465. Depaula and Roof Solutions countered that a contractor or subcontractor owed a duty of care only with respect to the personal property of the owner of the structure, who was a party to the roofing contract. *Id.* Relying on the "economic loss doctrine," they argued that no duty of care is owed to a third party unless there is an "intimate nexus" in the form of contractual privity or its equivalent, between the contractor or subcontractor and the third party. *Id.*

After clarifying the nature and purpose of the economic loss doctrine[6], we concluded that CCA's claim, that in negligently carrying out the roof replacement work, Depaula and Roof Solutions carelessly used a torch so as to accidentally set fire to the roof, constituted "a tort claim to which the economic loss doctrine has no relevance." *Id.* at 467. Thus, we looked to *Jacques* and *Whiting-Turner* to determine the duty of care in

---

[6] "The economic loss doctrine, which developed in product liability cases, prohibits a plaintiff from recovering tort damages for what in fact is a breach of contract." *Cash & Carry America*, 223 Md. App. at 466. The doctrine "serves as a boundary between contract law, the purpose of which is to enforce the expectations of the parties to an agreement, and tort law, the purpose of which is to protect people and property from foreseeable risks of harm by imposing upon others a duty of reasonable care." *Id.*

28

tort where there was no privity in contract or its equivalent. *Id.* at 468. We concluded that the risk of harm created by Depaula's misuse of the torch in performing the roof replacement work was one of personal injury and death as well as damage to personal property. *Id.* As a result, under *Jacques*, contractual privity or its equivalent was not a prerequisite for the law to recognize a duty of care in tort. *Id.* at 468-69. Instead, the principal determinant of whether a duty of care in tort should be recognized was foreseeability along with other factors including:

> the degree of certainty that the plaintiff suffered the injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty of exercising care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved.

*Id.* at 470 (quoting *Patton v. United States of America Rugby Football*, 381 Md. 627, 637 (2004)).

Applying those standards in *Cash & Carry America*, we concluded that it "was objectively evident that Depaula's careless use of the torch in performing the roof replacement work would cause the roof to catch fire, thereby creating a risk of personal injury, death, and property damage" not just to Coe, but to any visitor in the townhouse when the fire broke out. *Cash & Carry America*, 223 Md. App. at 470. In addition, "the risk of damage to items inside the townhouse would not vary depending upon who owned them[,]" and "it was reasonably foreseeable that negligent conduct resulting in a fire on

29

the townhouse roof could cause personal injury and death to people in adjacent townhouses, and to their personal property."[7]  *Id.* at 471.  We determined that contractual privity or some other special relationship between the roofers and third parties whose tangible personal property was located in or about the townhouse was not required.  *Id.* at 473-74.  Depaula and Roof Solutions had a "duty to exercise due care in performing the roofing work [that] included protecting CCA from sustaining damage to its tangible personal property inside the townhouse" regardless of whether the roofer had knowledge of the tangible personal property inside the townhouse or the identity of each owner of that property.[8]  *Id.* at 474.

With these principles in mind, we turn to the case at hand.  Appellants alleged that employees of Caviness and Parrish negligently failed to observe the corrosion or rust on the flue pipe used to vent the gas-powered boiler and hot water heater and negligently failed either to fix the flue or warn the occupants of 722 Shelby Drive about the possible

---

[7] We recognized that "obviously, a corporation or other business entity cannot sustain a personal injury and therefore never would face the risk of personal injury."  223 Md. App. at 471.

[8] Notwithstanding our holding with respect to tangible personal property, we rejected CCA's claim that it was entitled to recover the cost of repair or replacement associated with proprietary software on the computers that were damaged as a result of the fire, the loss of anticipated revenues, and losses associated with a delay in CCA's implementation of a business plan.  223 Md. App. at 475-76.  After determining that computer software was not tangible personal property, we held that the foreseeability principle and related factors did not support a reasonable conclusion that a duty of care pertained "to the risk of harm to non-tangible personal property and economic loss consequential to injury to non-tangible personal property."  *Id.* at 474.

danger of carbon monoxide escaping from it. Because the risk of harm created by Caviness and Parrish's alleged failure to observe, inspect, discover, repair, or warn was not solely economic, foreseeability is the principal determinant of whether a duty of care in tort should be recognized. *Jacques*, 307 Md. at 534-35. No contractual relationship or privity between appellants and either Caviness or Parrish was required. As we have already determined, neither the warranty agreement between Homesure and Ms. Chavez nor the service provider agreements between Homesure and Caviness and Parrish limited or extinguished any tort duties owed by the HVAC professionals to the occupants of the home.

There was no dispute below that improperly vented gas boilers and water heaters pose a risk of carbon monoxide leaking into a home and creating a risk of personal injury or death for the home's occupants. As both Caviness and Parrish acknowledged, rust or corrosion on a flue presents a risk that the structural integrity of the flue could be compromised and carbon monoxide could leak out into the interior of the home. The flue at issue was used to vent gases from the appliances serviced by Caviness and Parrish, both of whom worked in an area that required particular skills including familiarity with gas boilers and water heaters, the venting of those appliances, and the risks and dangers of carbon monoxide associated with them. As the Court of Appeals has recognized, "in those occupations requiring peculiar skill, a tort duty to act with reasonable care will be imposed on those who hold themselves out as possessing the requisite skill." *Jacques*, 307 Md. at 541 (citation omitted).

31

Caviness and Parrish argue that they had no duty to inspect the visible portion of the flue pipe or to address rust or corrosion on it because they did not create the dangerous condition, namely the improperly installed bathroom fan that had been spliced into the flue that was used to vent the exhaust from the boiler and hot water heater. They argue, in effect, that at most, their agents were passively negligent. *Jacques* and its progeny, however, do not make any such distinction between active and passive tortfeasors. Rather, those cases focus on the relationship between the parties, the nature of the risk of harm likely to result from a failure to exercise due care, and foreseeability.

In support of their arguments, Caviness and Parrish direct our attention to *Otis Elevator Co. v. Embert*, 198 Md. 585 (1951). In that case, Mary Embert filed a negligence action for personal injuries she sustained in an elevator located in a building owned by the defendant. *Id.* at 587. Embert stepped into an elevator that was not level with the floor and fell twelve and one-half inches to the bottom of the elevator car. *Id.* at 592-93. The building company filed a third-party action against Otis Elevator Co. ("Otis") alleging that Otis was liable to the building company for breach of a contract to provide elevator maintenance. *Id.* at 587. Eventually, Embert filed an amended complaint alleging negligence against both the building company and Otis. *Id.* A jury returned a verdict in favor of Embert against both the building company and Otis and in favor of Otis in the third-party action. *Id.*

The Court of Appeals reversed the judgment entered against Otis. In reaching that decision, the Court found that the scope of Otis's contractual undertaking was limited to maintenance, as distinguished from operation or advice regarding operation, and that it

32

never undertook "to make the elevator a different kind of elevator or to insure it against improper or negligent operation." *Id.* at 601. The Court concluded that "[n]o case has been cited, and we have found none, in which one who undertakes to maintain or repair has been held liable for failure to warn or instruct as to operation." *Id.* at 602.

Unlike *Otis*, in the instant case, there was no contractual provision in the service provider's agreement with Homesure that limited the scope of work of the HVAC companies. On the contrary, the agreement anticipated that the HVAC companies would do work beyond what was covered by the home warranty and contained provisions addressing such circumstances. Moreover, as the Court recognized in *Whiting-Turner*, there were no facts in *Otis* to establish a duty on the part of the elevator company:

> [D]enial of recovery to the injured elevator user was not grounded upon the absence of a duty running from the maintenance company to the injured plaintiff. Rather, we assumed that a duty of due care would extend to foreseeable users, but in the facts of the case found no duty on the part of the elevator company that could be related to the accident.

*Whiting-Turner*, 308 Md. at 31.

Similarly, Caviness and Parrish's reliance on *Cummins Atlantic, Inc. v. Sonny's Camp-N-Travel Mart, Inc.*, 481 F.Supp.2d 531 (D.S.C. 2007), a case involving South Carolina law, is also misplaced. In that case, Cummins Atlantic, Inc. ("Cummins"), admittedly improperly installed a generator on a recreational vehicle ("RV") that had been converted for use as a mobile dental facility in such a manner that the exhaust from the generator was not properly ventilated. 481 F.Supp.2d at 532. On one occasion after the generator was installed, Cummins serviced it, but failed to notice the improper ventilation problem. *Id.* Two months after Cummins serviced the generator, the owner

33

of the RV took it to Sonny's Camp-N-Travel Mart, Inc. ("Sonny's") to have the oil in the generator changed. *Id.* After the oil change, several individuals who were in the RV suffered personal injuries resulting from exposure to carbon monoxide gas that entered the vehicle as a result of the improper ventilation of the generator. *Id.* at 533. Several individuals filed suit against Cummins, whose insurer settled the claims. *Id.* Thereafter, Cummins filed suit against Sonny's seeking contribution under South Carolina's Uniform Contribution Among Tortfeasors Act. *Id.* During the course of that litigation, the employee of Sonny's who had changed the oil in the RV testified in a deposition that he did not see the exhaust problem. *Id.* at 534. Cummins argued that because Sonny's changed the oil in the generator, it had a duty to inspect and warn of problems with the generator's exhaust. *Id.*

Sonny's filed a motion for summary judgment arguing, among other things, that it had no duty to discover the defect that was created by Cummins. *Id.* The District Court agreed, holding that in undertaking to change the oil in the RV's generator, Sonny's did not undertake to inspect the generator's exhaust system. *Id.* at 538. In reaching that conclusion, the District Court relied upon *Byerly v. Connor*, 307 S.C. 441 (1992). In that case, Byerly was electrocuted when he dove into a lake from a houseboat that was moored to a dock that had been constructed and was maintained by a lessee of Santee Cooper. *Id.* at 537. An agent of Santee Cooper conducted yearly inspections of the docks and piers on the lake "solely for the purpose of ensuring that the docks and piers conform[ed] to structural requirements of permits issued by Santee Cooper." *Id.* (internal quotations and citations omitted). The Supreme Court of South Carolina concluded that

34

Santee Cooper had undertaken a limited duty to use due care to discover structural nonconformity with permits that did not include a duty to inspect for latent hazardous conditions at the marina. *Id.* at 538.

Unlike *Otis* and *Sonny's Camp-N-Travel Mart*, in the instant case there was evidence that because of the danger of carbon monoxide gas escaping from a compromised flue, a visual inspection of ventilation pipes for rust and corrosion was included in the scope of work of the service technicians who responded to Mrs. Chavez's calls for service. Mr. Caviness acknowledged that a rusted flue was dangerous because it could fall apart and cause carbon monoxide to leak into the home. He testified that his service technicians knew the equipment they worked on, and when troubleshooting to determine the problem with a furnace, checked "safeties" and "flues" as was "typical with anybody in this trade." According to Mr. Caviness, if a service technician saw rust or corrosion on a flue pipe leading from a furnace he or she would be expected to shut down the furnace.

Parrish's owner, chief executive officer, and corporate designee, Alan Givens, similarly testified that service technicians were trained to look for problems not covered by the home warranty, including rusted or corroded flue pipes, which they could, potentially, fix. Parrish's technician, Robert Rhoades, testified that it was standard practice among plumbers to "[d]o a check-over" of the flue to make sure it was "intact and not full of holes and stuff." He agreed that corrosion and rust could cause holes to form in the flue pipe and create a problem with carbon monoxide.

35

Parrish's expert, Kenneth McLauchlan, testified that when a service technician arrives at a home to repair a water heater, he or she is expected, among other things, to conduct an inspection of the "visible portions of the venting system" to determine if "the venting system was compromised in such a way that it needs to be replaced." He explained that one of the dangers with gas-fired appliances is the risk of carbon monoxide and that HVAC professionals "should be" trained to know that. Mr. McLauchlan testified that rust or corrosion on a flue pipe is a potential problem and that he would expect an HVAC professional "to determine if the venting system is compromised, if they see rust."

In addition to the relationship of the parties and the significant risk of personal injury or death associated with the escape of carbon monoxide from a rusted or corroded flue used to vent a gas boiler or hot water heater, the "other factors" that are pertinent to establishing whether a duty of care should be recognized were significant in the instant case. *See Patton*, 381 Md. at 637; *Cash & Carry America*, 223 Md. App. at 470. There was no dispute that the decedents died as a result of carbon monoxide gas being released into the house on Shelby Drive. The connection between the decedents and the conduct of the service technicians from Caviness and Parrish was close because (taking the evidence before the motions court in the light most favorable to appellants) if the technicians had inspected the visible portions of the flue they would have discovered rust or corrosion on the pipe and shut down the gas-powered appliances, warned Mrs. Chavez of the dangerous situation and replaced the pipe, thus preventing the escape of carbon monoxide gas into the home. The evidence before the motions court, if taken in the light

36

most favorable to appellants, was sufficient to show that responsibility for preventing future harm should rest with the HVAC professionals. The burden to HVAC professionals, who can avail themselves of training and insurance, is minimal while the consequences of imposing a duty of exercising care is a great benefit to the community because of the risks of personal injury and death from carbon monoxide escaping from gas-powered boilers and hot water heaters.

For all these reasons, under the facts of this case, we conclude that appellants' evidence was sufficient to allow a jury to find that Caviness and Parrish had a duty to exercise reasonable care in performing their respective work on the gas-powered boiler and hot water heater that included inspecting the visible portions of the flue for signs of rust or corrosion and, if the conditions impose a danger, take reasonable steps to protect the occupants of the home from carbon monoxide escaping from the flue into the home.[9]

---

[9] Cases from other jurisdictions have held that a service technician's duty to its customer includes the exercise of reasonable care and skill in the performance of that service and that that duty may be breached by the failure to conduct a safety inspection. *See e.g., Kilmer v. Browning*, 806 S.W.2d 75, 83 (Mo. Ct. App. 1991)(from evidence of rusted venting pipes in "deplorable condition" jury could conclude that gas company employee who inspected a furnace and venting system did not conduct an adequate inspection or he would have seen how badly the pipes were rusted); *Metropolitan Gas Repair v. Kulik*, 621 P.2d 313, 315 (Colo. 1980)(duty of gas service technician under contract to install a new circulation pump motor on boiler of heating system in plaintiff's home was not limited to mere installation of the motor, but extended to exercise of reasonable care and skill in performance of that duty and concluding that the duty would have been breached if technician failed to make a safety inspection of the boiler system and observe a plugged safety relief valve that was in plain view); *Washington Gas Light Co. v. Connolly*, 214 F.2d 254, 255-56 (D.C. Cir. 1954)(evidence was sufficient for a jury to find that service technician was negligent in failing to discover that automatic safety control regulating the flow of gas into burners was defective); *Phoenix Assur. Co. v.*

(Continued…)

"Reasonable steps" would include either warning the homeowner of the serious danger or by repairing or replacing the flue.

We conclude that whether Caviness and/or Parrish actually breached their duty to exercise reasonable care and caused damage to the plaintiffs' legally protected interests is a question of fact to be resolved by the finder of fact.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY REVERSED; COSTS TO BE PAID BY APPELLEES.**

---

(Continued)

*Texas Cities Gas Co.*, 100 S.W.2d 156 (Tex. Civ. App. 1936)(gas company that undertook to inspect furnace had duty to exercise ordinary care in making inspection and repairs or to advise the owner and afford him the opportunity to make the necessary repairs); *Miller v. Wichita Gas Co.*, 33 P.2d 130, 133 (Kan. 1934)("When the attention of the gas company was called to circumstances that indicated that the appliances were not burning the gas sufficiently to prevent the creation of carbon monoxide fumes, it was the duty of the company to call the dangerous condition of the appliances to the attention of the customers, . . . , advise him of the consequences that might follow the condition discovered, and to advise him that the gas would be shut off until he repaired the appliances.").