*EBC Properties, LLC v. Urge Food Corp.*, Case No. 1952, September Term 2021.  Opinion filed on February 28, 2023, by Berger, J.

TRADE FIXTURES – INTENT OF TENANT CONTROLS – REMOVAL FROM, AND REPAIR TO, REALTY NOT DETERMINATIVE

The three-factor fixture test articulated in *Dudley v. Hurst*, 67 Md. 44, 47 (1887), and relied upon by Maryland courts for nearly a century-and-a-half, focuses the analysis on the tenant's intent when determining if the chattels installed are "trade fixtures," and in so doing strictly construes the chattels' attachment to the realty such that even structures requiring tremendous effort to remove, and significant repairs following their removal, remain trade fixtures.  Because Tenant installed the chattels for the purpose of operating its grocery business, they were trade fixtures.  Further, because the chattels could be detached from the realty, and the realty could be repaired thereafter, the extent of the damage caused by their removal did not alter the chattels' status as trade fixtures.

TRADE FIXTURES – TRANSFER OF TITLE UPON DEFAULT – CONTRACT INTERPRETATION – REFUSAL TO IMPLY TERM TRANSFERRING TITLE

Where a landlord's claim to ownership of the trade fixtures is tied to an alleged breach of the lease prior to the end of its term, and not to the abandonment of property after such a term ends, "covenants restricting, or claiming to restrict, the tenants' ordinary right to remove such property, are always strictly construed, and cannot be extended by implication."  Though the lease provided that Tenant could not remove Tenant's Property, including the trade fixtures, if the Tenant was in default, and that abandoned items "shall become property of Landlord," this cannot be read to imply that title to the trade fixtures transferred to Landlord immediately upon Tenant's default, when no such term expressly transferring title existed.  Following Tenant's default, the installations and improvements made by Tenant remained trade fixtures and thus Tenant's Property.

TRADE FIXTURES – TRANSFER OF TITLE – COMMON LAW – PRESUMPTION OF ABANDONMENT

As the common law regarding trade fixtures dictates, a tenant ordinarily must remove its trade fixtures before the end of the lease term, or the fixtures become the property of the landlord, as any chattels left on the premises following the tenant quitting the realty are presumed abandoned.  The presumption of abandonment relies upon the principle that no injustice can be found if the tenant, on his own accord, surrenders the premises with fixtures annexed to it.  Because Landlord did not repossess the land upon Tenant's default but instead permitted Tenant to remain on the premises until the end of the lease term, Tenant's trade fixtures were never presumed abandoned, and Tenant could remove them at any point prior to the lease's termination date or Landlord's repossession of the realty.

## SCOPE OF REMAND – FURTHER PROCEEDINGS TO CLARIFY LIMITED ISSUE

A reviewing court may vacate the circuit court's ruling and remand the matter to the circuit court strictly to resolve an issue for which the reviewing court determines it may not properly evaluate the circuit court's ruling. The scope of such a remand will be limited to the circuit court conducting further proceedings, or reviewing the record already before it, so that it may better articulate clear factual findings and tie those findings to relevant law that cogently explains the circuit court's ruling.

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 1952

September Term, 2021

_____

EBC PROPERTIES, LLC

v.

URGE FOOD CORPORATION
_____

Berger,
Leahy,
Zic,

JJ.

_____

Opinion by Berger, J.
_____

Filed: February 28, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This appeal arises from a dispute between a landlord and its tenant regarding the transfer of chattels installed in the rented commercial realty and the restoration of the rented realty at the conclusion of the lease. On September 27, 2019, Appellee and tenant Urge Food Corporation ("Urge") filed suit in the Circuit Court for Prince George's County seeking a declaratory judgment and damages for breach of contract. Appellant and landlord EBC Properties, LLC ("EBC") filed a counterclaim and a third-party complaint against Urge and the individual guarantors of the lease contract between Urge and EBC, for breach of contract, as well as for detinue and conversion.

The circuit court conducted a two-day bench trial via Zoom on May 24 and 25, 2021.[1] The court ruled in favor of EBC regarding Urge's complaint for breach of contract and requested post-trial briefing from both parties as to the remaining issues. After both parties submitted such briefing, the trial judge issued a ruling from the bench. The court issued judgment in favor of EBC as to its claims that Urge breached the contract by failing to pay additional rents. The court ruled in favor of Urge as to EBC's claims of conversion, damages, and detinue regarding Urge removing property it installed to operate its grocery business on the premises and as to EBC's claim that Urge failed to fully repair the premises to the same condition it was in prior to the start of Urge's tenancy. The circuit court entered its judgment, and EBC filed its notice of appeal the following day.

---

[1] "Zoom is an online video platform, which has been used to facilitate remote hearings because some court hearings have not been able to be held in person due to the COVID-19 pandemic." *Tallant v. State*, 254 Md. App. 665, 688 n.17 (2022) (citing *Remote Hearing Toolkit*, Md. Cts., https://mdcourts.gov/legalhelp/remotehearing (last visited Dec. 1, 2022), archived at https://perma.cc/UCV5-7JNN.

EBC presents three questions for our review, which we reorder but otherwise present verbatim below:

> I.   Whether the Circuit Court erred when it ruled that all of Urge's installations were trade fixtures and, therefore, "Tenant's Property" under the terms of the Lease.
>
> II.  Whether the Circuit Court erred when it found that Urge retained a right to remove its "Tenant's Property," and that such items had not become the property of EBC.
>
> III. Whether the Circuit Court erred when it found that Urge was not liable to EBC for the costs to restore the Premises to the condition required in the Lease.

For the reasons explained herein, we affirm on the first two questions and remand for further proceedings, without affirming or reversing, on the third question.

## FACTS AND PROCEDURAL HISTORY

### *The Relevant Provisions of the Lease Contract*

On August 30, 2006, Urge and EBC -- as Tenant and Landlord, respectively -- entered into a thirteen-year contract ("the Lease"), running from October 1, 2006 to September 30, 2019, in which Urge rented 2340 University Boulevard East in Adelphi, Maryland ("the Premises"), a commercial retail space in a strip mall owned by EBC. Section 14 of the Lease permitted Urge to freely make improvements and alterations to the Premises, so long as such improvements did not affect utility systems or the building's structure. Section 14 further provided that such improvements (including "trade fixtures") not permanently affixed to the building, would remain Urge's property unless "abandoned"

2

in the event of default or the termination of the lease.[2] In the event of Urge's default under Section 15 of the Lease, EBC reserved the right to terminate the lease, to re-enter and repossess the Premises -- including all of Tenant's Property deemed abandoned therein -- and to re-rent the Premises. Section 15 further provided that the Landlord would be considered in default if it failed to cure an alleged breach of the Lease within 30 days of receiving written notice thereof.

Section 4 of the Lease imposed the responsibility on Urge to pay two categories of rent, noting that the failure to pay either would be treated as a default under the Lease. "Basic Rent" referred to the yearly cost for Urge to use and enjoy the Premises, paid in monthly installments, with relevant provisions regarding annual increases and late fees. The Lease also required the payment of "Additional Rent," related to the Tenant's Covenants under Section 8 of the Lease, including section 8(K), which required Urge to contribute to Common Area Costs ("CAM Charges") such as utilities, insurance premiums, maintenance and repair expenses, trash removal, and "fees and personnel costs" related to the hiring of engineers, superintendents, and security.

***Tenant Improvements and Installations***

Prior to Urge's tenancy, the Property had served as a used clothing store. When Urge took possession, the Premises was "completely empty." Urge undertook extensive efforts to ready the location for its intended use as a grocery store. Urge installed numerous

---

[2] Under the terms of the Lease, "Tenant's Property" included "any movable goods, inventory, furniture, equipment trade fixtures and machinery necessary to the conduct of its business, and such items together with other movable personal property belonging to Tenant that are not permanently affixed to the Premises."

3

chattels related to operating a grocery, making the requisite improvements to the plumbing, electrical, and HVAC systems to accommodate these installations, including seafood, meat, and deli counters; a bakery, including an oven and hood for ventilation; display cases; checkout counters and registers; interior freezer cases; and similar chattels common to grocery stores. Notably, there were four walk-in coolers connected to the outside of the building that required holes to be cut in an exterior wall, the installation of a concrete slab to which the coolers were bolted, wood framing to be erected for their support, and connections made to the HVAC and fire suppression systems. EBC approved all such improvements where it was required to do so.

*Dispute Over Security and Departure from the Premises*

Shortly after Urge began operating, crime became an issue, with customers and employees falling victim to automobile break-ins, stolen property, robbery, and knife attacks. After notifying EBC, and finding their response insufficient, Urge began hiring its own security personnel to keep watch of the grocery store ("Mega Mart") and parking lot but not the other properties in the strip mall. By December of 2017 -- roughly a decade later -- EBC also became concerned about crime and hired its own security company to patrol the entire strip mall property, including the Mega Mart. When EBC sought proportional compensation from Urge, Urge refused to pay, maintaining that it was content with the security company it already contracted with and did not see a need to pay for redundant services. EBC pointed out that such security costs were part of the CAM Charges that Urge was required to pay under "Additional Rent" in Sections 4 and 8(K) of the Lease.

4

EBC, through counsel, sent a letter to Urge on May 15, 2019, noting that under the terms of the Lease, the Lease would terminate on September 30, 2019, at which point Urge should vacate the Premises. The letter also demanded Urge cure its breach of the Lease by May 22, 2019, pertaining to $52,083.97 in unpaid CAM Charges, or EBC would have "no alternative but to pursue all legal remedies available." EBC sent Urge another letter on June 7, 2019, again requesting that the outstanding balance of $52,083.97 be paid by June 17, 2019, and explaining the origins of the security charges, water usage, grease trap charge, and cleaning charge. On September 17, 2019, EBC sent another letter to Urge as notice of the Additional Rent arrearages that had been accruing since 2017. In the letter, EBC warned that the owed amounts continued to accrue, and that failure to timely pay would be considered a default under the Lease. Further, the letter reminded Urge that in the event of default, Section 14(A) of the Lease prevented Urge from removing its installed chattels, which EBC expressly listed, thus removal would be considered additional breach.

Around this same time, Urge believed it was paying above-market rent and decided to vacate the Premises at the end of the term of the Lease and move to a new location.[3] During September of 2019, Urge began removing most of the items it installed as it prepared to vacate. The security company hired by EBC confronted Urge personnel while they were removing the installations at night, informing Urge employees they were to "leave it how it is." Urge proceeded to cover the windows so EBC's security could no longer see inside as Urge continued removing the installations from the Mega Mart.

---

[3] Shortly after vacating the Premises, Urge relocated its grocery business, along with some of the chattels removed from the Premises, to a new location a short distance away.

5

Security personnel alerted EBC to Urge's actions, but EBC told security to not intervene and to avoid conflict.

*Prior Legal Proceedings*

On September 27, 2019, Urge filed a two-count complaint in the Circuit Court for Prince George's County, alleging EBC breached the contract by preventing Urge from removing all of its property, including the exterior walk-in coolers, which were trade fixtures. Urge also sought declaratory relief that Urge was the sole owner of the exterior trade fixtures and thus had a right to remove such fixtures. Urge further maintained that EBC should be enjoined from preventing the removal of the remaining trade fixtures.

EBC responded with a three-count counterclaim on October 24, 2019, eventually filing its fourth-amended counterclaim and third-party complaint on April 23, 2021.[4] In Count I, EBC alleged Urge breached the contract by failing to pay the additional rent, and then further breached the Lease by removing fixtures and failing to make necessary repairs in violation of the Lease. EBC sought damages in excess of $75,000.00, as well as attorney's fees. In Count II, EBC sought detinue for the return of the installations Urge had removed. EBC claimed such removal was in violation of the lease and committed through trespass, and that Urge unjustly detained the removed chattels. Similarly, Count III alleged conversion of the chattels removed as well as the walk-in coolers left at the Premises, now deemed inoperable due to damage resulting from Urge's removal of HVAC

---

[4] In EBC's third-party complaint, it named as third-party defendants Uriel Ochoa Diaz, Alba Rivas, Gerson Lopez, Lillian Lopez, and Dos Friends, Inc., who were the guarantors of the lease on behalf of Urge.

6

and plumbing extensions connecting the walk-ins to the building. EBC sought the return of the property, damages in excess of $75,000.00, as well as attorney's fees.

The dispute progressed to a two-day bench trial conducted on May 24 and 25, 2021. Both sides put forth evidence and testimony from expert witnesses as to the removed chattels and damage sustained by the Premises upon their removal, as well as the prior security issue, and EBC's response. During the hearing, the court granted EBC's motion for judgment regarding the claim it had breached the contract by failing to provide security when prompted. The court found that Urge did not provide written notice, as required by the Lease, of the crime issues and the need for security, and therefore -- as a matter of law -- EBC did not breach the Lease. Following the hearing, the court requested additional briefing.

On October 26, 2021, the court issued its ruling from the bench, disposing of all claims against Urge and the third-party defendants. The court found Urge was in default for its failure to pay the CAM Charges. Regarding the improvements and chattels Urge installed at the Premises, the court found such items were "all trade fixtures," as they were installed in order to "operate[] a food store" and had not been permanently attached to the realty but could be removed with any resultant damage being repairable. As such, the chattels remained the property of Urge, which could remove the items prior to the conclusion of the Lease. The trial court further found that EBC was not entitled to any replacement costs and the only right EBC had in the chattels was that they could have been "held until such time as Urge paid whatever fees it owed to EBC for breach." The court proceeded to find that Urge had an obligation to return the Premises to the state it was in

7

prior to the commencement of the lease, but that, by locking Urge out of the building, EBC prevented Urge from removing all of its chattels and repairing the damage to the Premises.

The court entered judgment in favor of EBC, and against Urge and the third-party defendants, for $41,209.00, representing the outstanding balance of the Additional Rent regarding the unpaid amounts for fat grease removal ($537.00), snow removal ($710.00), CAM Charges ($1,612.00), and security personnel ($38,350.00). Thereafter, EBC filed a motion for reconsideration. The trial court denied the motion, did not alter its earlier findings, and memorialized the bench ruling in an order sheet dated December 20, 2021 and docketed January 18, 2022. On February 11, 2022, EBC filed this timely appeal.

## DISCUSSION

### Standard of Review

Because this dispute reaches this Court following a bench trial, we "review the case on both the law and the evidence." Md. Rule 8-131(c). "[We] will not set aside the judgment of the trial court on the evidence unless clearly erroneous, and [we] will give due regard to the opportunity of the trial court to judge the credibility of the witnesses." Md. Rule 8-131. Clear error exists where the trial court's factual findings are not supported by competent evidence. *Spaw, LLC v. City of Annapolis*, 452 Md. 314, 339 (2017). "If there is any competent and material evidence to support the factual findings of the trial court, those findings cannot be held to be clearly erroneous." *Carroll Indep. Fuel Co. v. Wash. Real Est. Inv. Tr.*, 202 Md. App. 206, 224 (2011) (quoting *Jackson v. 2109 Brandywine*, 180 Md. App. 535, 567 (2008)).

We do not afford the same deference to the trial court's conclusions of law. *Id.* "Instead, we apply a *de novo* standard of review to determine whether the court's conclusions are legally correct." *Id.*; *Cain v. Midland Funding, LLC*, 452 Md. 141, 151–52 (2017) ("[W]hen a trial court 'order involves an interpretation and application of Maryland . . . case law, our Court must determine whether the lower court's conclusions are "legally correct" under a *de novo* standard of review.'" (quoting *Walter v. Gunter*, 367 Md. 386, 392 (2002)). If we find the trial court erred in its understanding or application of law, ordinarily "further proceedings in the trial court" are warranted, unless the error is harmless. *Reichert v. Hornbeck*, 210 Md. App. 282, 304 (2013) (quoting *In re Yve S.*, 373 Md. 551, 586 (2003)). We will disturb conclusions of the trial court, "founded upon sound legal principles and based upon factual findings that are not clearly erroneous . . . only if there has been a clear abuse of discretion." *Id.* at 304.

## I. The Circuit Court Correctly Classified as Trade Fixtures the Chattels Installed, and Later Removed, by Urge for the Purpose of Operating a Grocery Business.

The circuit court correctly applied the relevant law in concluding the chattels Urge installed on the Premises were trade fixtures. Sufficient evidence was presented to demonstrate that the varying pieces of equipment Urge installed were both associated with running a grocery business and were not permanently affixed to the realty. We, therefore, hold that the circuit court was factually and legally correct in finding that the property installed by Urge constituted trade fixtures because of their movable status, coupled with Urge's clear intention to make such investments as a means to benefit the use of the Premises to carry out its grocery business trade.

9

Whether a chattel changes from personal property to a fixture attached to the realty is a mixed question of law and fact. *Droney v. Droney*, 102 Md. App. 672, 686 (1995). For mixed questions of law and fact, this Court reviews the circuit court's evidentiary findings for clear error, so long as we find no error in the court's application of the law. *Storetrax.com, Inc. v. Gurland*, 168 Md. App. 50, 81 (2006).

The term "fixture" in property law references some personal chattel that has become so affixed to the realty, actually or constructively, as to become a part of the realty and no longer distinguishable from it. *Carlin v. Ritter*, 68 Md. 478, 483 (1888). The "general rule of the common law certainly is, that whatever is once annexed to the freehold becomes part of it, and cannot afterwards be removed, except by him who is entitled to the inheritance." *Van Ness v. Pacard*, 27 U.S. 137, 143 (1829); *see also Colonial Pipeline Co. v. State Dep't of Assessments & Tax'n*, 371 Md. 16, 32–33 (2002).

An exception to this common law rule on fixtures pertains to "trade fixtures," which are not treated as part of the realty but remain removable by the tenant. *Supervisor of Assessments of Anne Arundel Cnty. v. Hartge Yacht Yard, Inc.*, 379 Md. 452, 463–64 (2004); *see also Van Ness*, *supra*, 27 U.S. at 143–44 ("Fixtures which were erected to carry on trade and manufactures, were from an early period of the law allowed to be removed by the tenant, during his term; and were deemed personalty for many other purposes."). "A trade fixture commonly is defined as an item affixed to realty for the purpose of enabling the tenant to perform properly a trade or profession, which can be removed without material or permanent injury to the realty." *Colonial Pipeline Co.*, *supra*, 371 Md. at 34–35. "The policy justification for the trade fixtures exception is to encourage trade," so that tenants

10

would not be reluctant to invest in the beneficial use of the land for fear that improvements made in the name of carrying out the tenant's business would be lost upon the termination of the lease. *Id.* at 34–35 (2002) (citing *Van Ness v. Pacard*, 27 U.S. 137, 143–44 (1829)).

Roughly 145 years ago, the Supreme Court of Maryland (at the time named the Court of Appeals of Maryland)[5] articulated a three-factor test to identify fixtures. *Hartge Yacht Yard, Inc.*, *supra*, 379 Md. at 463 (citing *Dudley v. Hurst*, 67 Md. 44, 47 (1887)).

> First, annexation to the realty either actual or constructive. Second, adaptation to the use of that part of the realty with which it is connected. Thirdly, the intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article annexed, the situation of the party making the annexation, the mode of annexation, and the purpose for which it was annexed.

*Colonial Pipeline Co.*, *supra*, 371 Md. at 33–34 (quoting *Dudley v. Hurst*, 67 Md. 44, 47 (1887)). For trade fixtures, "the touchstone" of the fixture test is intent. *Id.* at 35. "The sole question is, whether it is designed for purposes of trade or not." *Id.* (quoting *Van Ness v. Pacard*, 27 U.S. 137, 146 (1829)). "When the proper intent is found, '[n]o matter how strongly [the fixtures are] attached to the soil or imbedded in it, they are treated as personal property, and as such subject to removal by the person erecting them.'" *Id.*

---

[5] At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022. *See also* Md. Rule 1-101.1(a) ("From and after December 14, 2022, any reference in these Rules or, in any proceedings before any court of the Maryland Judiciary, any reference in any statute, ordinance, or regulation applicable in Maryland to the Court of Appeals of Maryland shall be deemed to refer to the Supreme Court of Maryland . . . .").

11

(quoting *N. Cent. Ry. Co. v. Canton Co.*, 30 Md. 347, 352 (1869)). "This exception in favor of trade fixtures has been held applicable in the cases we have cited to houses, steam engines, furnaces, railway tracks, cider mills, and like structures." *L.A. Thompson Scenic Ry. Co. v. Young*, 90 Md. 278, 282 (1899).

Maryland courts continue to rely on the three-part *Dudley* test, focusing the analysis on the tenant's intent when determining if the chattels installed are "trade fixtures" and, in so doing, strictly construing the chattel's attachment to the realty such that even structures requiring tremendous effort to remove, and significant repairs following their removal, remain "trade fixtures." The Supreme Court of Maryland has held that mooring buoys installed in a riverbed were trade fixtures as they existed "to provide marina users a service that [the marina operator] directly profited from" by "generat[ing] rent for Hartge's marina operation." *Hartge Yacht Yard, Inc.*, *supra*, 379 Md. at 466. Because the marina operator did not intend for the buoys to permanently remain on the river bottom, they were not fixtures. *Id.* at 465–66. Further, despite needing a crane to do so, they could be removed without causing serious damage to the riverbed. *Id.* at 464.

Similarly, the Supreme Court of Maryland has held that a 2,889-mile oil pipeline stretching through multiple states was a not a traditional fixture but a trade fixture. *Colonial Pipeline Co.*, *supra*, 371 Md. at 38. The Supreme Court of Maryland noted that the two controlling factors of the *Dudley* "fixture test" made the pipeline a "trade fixture" because the pipeline was not so affixed to the realty that, despite its excavation causing damage to the realty, such damage caused by its removal was "only temporary," and could

12

be repaired. *Id.* The Court further noted that Colonial's "single factor in installing the pipeline system [was] to operate a business for profit" of transporting petroleum. *Id.* at 39.

A scenic railway "was to all intents and purposes a trade fixture" as it was attached to the realty through brick piers, "constructed in a firm and substantial manner" and built for the purpose of operating a "summer resort." *L.A. Thompson Scenic Ry. Co.*, *supra*, 90 Md. at 279, 282. As such, the landlord could not prevent the tenant's removal of the elevated railway at the conclusion of the lease. *Id.* at 282. Similarly, a railway installed for the purpose of operating a railway company remained the personal property of the company and did not merge with the freehold and thus transfer to the owner of the realty upon which it was laid. *N. Cent. Ry. Co. v. Canton Co.*, 30 Md. 347, 355 (1869). Even a house and other structures constructed so that their occupants could otherwise operate a business on the land did not become traditional fixtures, affixed to the realty, but remained the character of trade fixtures and thus could be removed by the tenant. *Van Ness*, *supra*, 27 U.S. at 147 (holding a residence built on a dairy farm for the purpose of the inhabiting family and servants to engage in the dairy business was a trade fixture).

The trial court in this case did not err in finding the chattels installed by Urge prior to the operation of their grocery business constituted trade fixtures. The record contains ample evidence from which the trial court arrived at this sound conclusion, and the court's findings align with relevant Maryland law defining trade fixtures. As the Supreme Court of Maryland noted in *Colonial Pipeline*, the controlling factor in the *Dudley* "fixture test" is intent. 371 Md. at 35. Urge acquired the chattels, and made the requisite improvements and installations, for the purpose of operating a grocery store that provided fresh and frozen

13

food to customers at the Premises rented from EBC.  Indeed, Gerson Lopez Giron, one of the partners of Urge, testified that upon taking over the Premises, it was "completely empty," requiring Urge "to do all types of construction, everything from plumbing to electric, to refrigeration."  All of the chattels Urge installed related to the operation of a grocery business: deli counters, walk-in coolers, freezers, display cases, shelving, registers, and bakery ovens.  Urge proceeded to operate the Premises as Mega Mart grocery store for the life of the lease.  Based on intent alone, the chattels installed by Urge constituted trade fixtures.

Further, applying the strict interpretation of "permanency" in the cases referenced above, the installations were not so affixed to the Premises to lose their status as trade fixtures.  An April 19, 2021 letter sent to Urge by Nicholas Wijtenburg (a civil and structural engineer licensed in Maryland and hired by Urge to assess the structural changes to the Premises related to the grocery store installations) asserted that: (1) the exterior walk-in coolers were temporary elements fastened to a platform; (2) the roof structure over the exterior coolers could be removed; and (3) the removal of accessory coolers and the relevant extensions of the sprinklers and cooling systems made to service those coolers did not negatively affect the building systems.

Indeed, Mr. Wijtenburg was qualified as an expert witness and testified how the walk-in coolers were "standalone structures" bolted to the Premises on a platform and thus could be removed without affecting the structural integrity of the Premises.  There was "no distinct structural connection" between the coolers and the building.  Removal of the coolers would require minimal repair to the concrete slab and the mending of the four holes

14

cut in the wall, all of which Mr. Wijtenburg deemed non-permanent damage. Mr. Wijtenburg testified that the display freezers, cold-display cases, deli counters, ovens, tables, and similar installations were only attached to the building as much as necessary to provide safety and stability, but that they were not permanently affixed to the Premises.

Accordingly, the record contains competent evidence to support the circuit court's determination that the improvements made by Urge were for the purpose of conducting its trade and were sufficiently removable and impermanent to retain their character as trade fixtures. As a result, the circuit court's ruling was not clearly erroneous. *Spaw, LLC, supra*, 452 Md. at 339. If accessory structures like houses, or vast industrial undertakings like sunken mooring buoys, buried pipelines, stretches of railroad tracks, and an elevated railroad platform were considered trade fixtures (primarily because they were installed for the purpose of furthering a tenant's productive use of the rented realty by conducting the tenant's business), then chattels *installed for the purpose of running a grocery store*, that were removable by the same party who installed them, requiring repair that did not otherwise compromise the building's structural integrity or result in "permanently damaging the realty," also constitute "trade fixtures*." See Hartge Yacht Yard*, *supra*, 379 Md. at 465.

We, therefore, affirm the circuit court's ruling that the chattels installed by Urge were trade fixtures. As such, Urge could remove its trade fixtures prior to the termination of the Lease, barring any controlling provisions of the Lease to the contrary. Accordingly, we turn our attention to the precise time the Lease terminated in order to ascertain Urge's

15

ability to both remove such trade fixtures and to repair the damage to the Premises caused by their installation and subsequent removal.

## II.     Neither the Lease Nor the Common Law Vested Title to the Trade Fixtures in EBC Immediately Upon Default.  As a Result, Urge Was Free to Remove Its Trade Fixtures Prior to the End of the Lease's Term, Barring EBC Asserting Its Claim to the Trade Fixtures Prior to That Date.

### A.     *The Lease Did Not Expressly Require Title of Urge's Trade Fixtures to Transfer to EBC Immediately Upon Default. Therefore, Urge's Removal of Such Property Prior to the Termination Date -- and EBC's Failure to Assert Its Claim to the Property Prior to that Date -- Resulted in Urge Retaining Ownership of Its Trade Fixtures.*

Urge's breach of the Lease due to its failure to pay the outstanding Additional Rents (mostly tied to its refusal to pay for what it deemed "redundant" security personnel), is not before us.   Germane to this matter regarding the removal of trade fixtures, though, is the timing of when Urge defaulted, and how that default affected other rights and obligations under the Lease.  Thus, we examine the Lease, in the context of relevant Maryland law, to assess the implications of Urge's default on the potential transfer of the trade fixtures.

The trial court's interpretation of a contract "is a question of law that we review *de novo*." *Landaverde v. Navarro*, 238 Md. App. 224, 243–44 (2018).  Our chief concern in interpreting a contract is ascertaining and giving effect to the objective intentions of the parties, as determined from the language of the contract itself and reading the instrument as a whole. *Id.*  "If the contract language is unambiguous and capable of only one meaning, we will give effect to its plain, ordinary, and usual meaning, taking into account the context in which it is used." *Id.* (citing *100 Inv. Ltd. P'ship v. Columbia Town Ctr. Title Co.*, 430 Md. 197, 234 (2013)).

16

"As a bedrock principle of contract interpretation, Maryland courts consistently 'strive to interpret contracts in accordance with common sense.'" *Credible Behav. Health, Inc. v. Johnson*, 466 Md. 380, 397 (2019) (quoting *Brethren Mut. Ins. Co. v. Buckley*, 437 Md. 332, 348 (2014)). "The rule to be applied is that an interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh or unreasonable result, so that a reading which produces a forfeiture will not be favored." *City of Balt. v. Indus. Elecs., Inc.*, 230 Md. 224, 229 (1962). "It is presumed that parties contract with a knowledge of the existing law . . . and such law becomes a part of the contract unless expressly rejected as inapplicable." *Cabana, Inc. v. E. Air Control, Inc.*, 61 Md. App. 609, 616 (1985).

The Lease permitted Urge to make improvements and alterations to the Premises, though improvements affecting utility systems or the building's structure required EBC's approval. Indeed, Section 14(A) of the Lease provided that Urge had the "privilege of installing any movable goods, inventory, furniture, equipment, trade fixtures and machinery necessary to the conduct of its business," and that such items installed would remain the personal property of the Tenant ("Tenant's Property") and remain removable by the Tenant at the conclusion of the lease, so long as the items were not "permanently affixed to the Premises."[6] Section 14(B) further provided that the Tenant shall remove all

---

[6] Section 14(A) of the Lease provides:

> Subject to the terms and conditions of this Section 14, all present and future alterations, additions, renovations, improvements and installations made to the Premises,

17

Tenant's Property and repair all damage to the Premises caused by the installation and removal of such chattels and return the Premises to the state it was in before Tenant took possession, with allowance for normal wear and tear.[7]  This section also provides that if

including the HVAC system ("Leasehold Improvements"), shall be deemed to be the property of Landlord when made and, upon Tenant's vacation or abandonment of the Premises, unless Landlord directs otherwise, shall remain upon and be surrendered with the Premises in, good order, condition and repair. Tenant shall have the privilege of installing any movable goods, inventory, furniture, equipment, trade fixtures and machinery necessary to the conduct of its business, and such items together with other movable personal property belonging to Tenant that are not permanently affixed to the Premises shall remain Tenant's property ("Tenant's Property"). Tenant's Property shall be removable by tenant at any time, provided that Tenant (i) is not in default under this Lease, and (ii) shall repair any damage to the Premises or the Building caused by the removal of any of Tenant's property to restore the Premises or the Building to their original condition. Return of the premises should not require the removal of approved alterations which would also help in re-letting.

[7] Section 14(B) of the Lease provides:

Upon the expiration or sooner termination of the Term of this Lease, Tenant shall quit and surrender to Landlord the Premises, broom clean, and in good order and condition, ordinary wear and tear and acts of God and casualty damage, and condemnation excepted; and shall surrender to Landlord all keys to or for the Premises and inform Landlord of all combinations on locks, safes and vaults, if any, left by Tenant in the Premises. Tenant shall remove all of Tenant's Property and shall repair all damage to the Premises caused by such removal and restore the Premises to the condition in which they were in prior to the installation of the articles so removed, ordinary wear and tear and acts of God and casualty damage excepted, prior to the Termination Date or the termination of Tenant's right to possession. In the event of failure of Tenant

18

Urge failed to remove its Tenant's Property before the expiration of the Lease, "it is agreed that Tenant is abandoning said item, and the same shall become property of Landlord."

Section 15 of the Lease defined the Tenant's default as a failure to pay Basic or Additional Rent within 10 days of written notice and provided the Landlord the option upon such default of terminating the lease, re-entering and repossessing the property, and re-renting the Premises.[8]  Parallel to EBC's legal rights under this Lease is Maryland law

---

to remove such items from the Premises before expiration of this Lease, it is agreed that Tenant is abandoning said item, and same shall become the property of Landlord, who shall have the right to use, remove or dispose of said items as Landlord shall desire. Tenant's obligation to observe or perform this covenant shall survive the expiration or sooner termination of the Term of this Lease.

[8] Section 15(A) of the Lease provided the "Definition of Default:"

For purposes of this Lease, the term "Default" shall mean any failure by Tenant to (i) pay the Basic Rent and/or Additional Rent herein reserved within ten (10) days after written notice of non-payment; (ii) keep and perform any or all of the other covenants and agreements on its part, to be kept and performed hereunder within thirty (30) days after written notice from the Landlord to Tenant specifying the nature and extent of the default or breach of covenant, or if such default is not susceptible of cure within thirty days, to commence the cure within thirty days and prosecute the same diligently to completion; and (iii) continuously operate as required under this Lease, or if Tenant shall vacate or abandon the Premises.

Section 15(B) provided the "Landlords Remedies Upon Default:"

In the event of a Default, Landlord may, at its option, exercise one or more of the following remedies: (i) terminate the Lease and the Default shall operate as a notice to quit, all and every kind of notice to quit being hereby expressly waived by

19

permitting a landlord to bring an action for unpaid rent under the provisions of a lease with a term longer than three months, and to conduct a "sale under distress" of property installed by the tenant but remaining on the realty following default, to pay the outstanding rent claim. Md. Code, (1974, 2015 Repl., 2021 Suppl.) § 8-302(c) of the Real Property Article ("RP"); RP § 8-320(a).

Reading these Lease provisions in concert, we agree with EBC that Urge was in default when it failed to cure, within 10 days of receiving notice thereof, its delinquency as to the Additional Rents required under Sections 4 and 8 of the Lease. As such, EBC could have exercised its remedies under Section 15 of the Lease at any point between the close of that 10-day notice period and September 30, 2019, the actual termination date of the Lease. In so doing, it could have re-entered and repossessed the premises. In accordance with Section 14(B), any of the trade fixtures remaining on the realty, and any other Tenant's Property, would have been treated as abandoned, and, thus, EBC could have rightfully taken possession of such Tenant's Property. Because EBC never took such steps, we need not determine which letter alerting Urge of default triggered the 10-day period

---

Tenant; (ii) re-enter and or obtain possession of the Premises under and by virtue of appropriate legal proceedings under the laws of the State of Maryland regulating proceedings between landlords and tenants, or by such other proceedings as may, at the time, be in full force in like cases, and the Default shall operate as notice to quit, all and every kind of notice to quit being hereby expressly waived by Tenant; (iii) re-rent Premises.

after which EBC could have repossessed the Premises and all Tenant's Property "abandoned" therein.

We distinguish this dispute from a similar case with somewhat more exacting contract language. This Court held that underground gas tanks installed by a tenant were trade fixtures that transferred to the owner of the real property upon termination of the lease, in accordance with the lease terms, after a dispute arose when the tenant left the tanks buried at the site after vacating the realty. *Carroll Indep. Fuel Co. v. Wash. Real Est. Inv. Tr.*, 202 Md. App. 206, 229–30 (2011). In *Carroll Independent Fuel Co.*, the lease expressly provided the trade fixtures transferred to the landlord upon the termination of the lease. 202 Md. App. at 229. Under the terms of EBC and Urge's Lease, Section 14(A) provided that Urge could not remove Tenant's Property, which included the trade fixtures, if Urge was in default, and Section 14(B) said that abandoned items "shall become property of [EBC]." Neither provision expressly conveyed title of such trade fixtures to EBC immediately upon the occurrence of Urge's breach. As such, we will not imply such a term.

Further, even without the rights provided by Section 14(B), EBC could have taken possession of any abandoned trade fixtures and sold as many as needed to cover the outstanding rent owed by Urge under Section 8-320(a) of the Real Property Article. The circuit court appeared to reckon with this statute in its ruling. While articulating its understanding of the potential stake EBC had in Urge's trade fixtures, the circuit court noted that EBC could have prevented Urge from removing its property due to Urge's default, but that "didn't mean that the items became the property of EBC. If anything, the

21

property could just be held until such time as Urge paid whatever fees it owed to EBC for any breach." The circuit court further surmised that if such fees owed by Urge were not paid after EBC seized the trade fixtures, "EBC could sell them and take what was owed to it and give any money left over to Urge."

The circuit court never construed the Lease as transferring title of the trade fixtures from EBC to Urge. Reading the contract similarly avoids a "harsh or unreasonable result"; otherwise Urge's failure to pay roughly $50,000.00 in contested fees would provide EBC with a windfall of several hundred-thousand-dollars'-worth of chattels installed by Urge. *See Indus. Elecs., Inc.*, *supra*, 230 Md. at 229. In short, we see no error in the trial court's interpretation of the Lease.

> **B.** *Maryland Common Law Regarding Trade Fixtures Does Not Require that Ownership of Such Fixtures be Immediately Transferred to EBC Upon Urge's Breach.*

As we discussed *supra*, trade fixtures are unique because, unlike traditional fixtures, they retain their status as the personal property of the tenant, and thus they retain that character upon the conclusion of the lease. *See Teddy-Rose Enters., Inc. v. Hartford Fire Ins. Co.*, 48 Md. App. 466, 470 (1981) (stating common law rule that traditional fixtures remain with the realty). A tenant ordinarily must remove its trade fixtures before the end of the lease term, or the fixtures become the property of the landlord, as any chattels left on the premises following the tenant leaving are presumed abandoned. *See Cabana, Inc.*, *supra*, 61 Md. App. at 615. This rule is tied to the presumption of abandonment arising from the tenant quitting the premises while leaving the trade fixtures behind, as no injustice can be found if the tenant, on his own accord, surrenders the premises with fixtures annexed

22

to it. *See Carlin*, *supra*, 68 Md. at 483–84. Nevertheless, where, as here, the landlord's claim to the trade fixtures is tied to an alleged breach of the lease prior to the end of its term, and not the abandonment of property after such a term ends, "covenants restricting, or claiming to restrict, the tenants' ordinary right to remove such property, are always strictly construed, and cannot be extended by implication." *Rasch*, *supra*, 136 Md. at 438.[9]

EBC points us to this Court's decision in *Cabana* as controlling. 61 Md. App. at 616–17. In attempting to decipher the applicability of a mechanic's lien on a building deemed a trade fixture that remained on the landlord's property following default, we held

---

[9] Urge analogizes its installations to those the Supreme Court of Maryland deemed "trade fixtures" that remained the property of the tenant, despite potential contract language dictating otherwise, in *Rasch v. Safe Deposit & Tr. Co.*, 136 Md. 435, 440 (1920). In *Rasch*, the tenant leased a building with an empty elevator shaft and proceeded to install first a hand-operated elevator, then the requisite machinery and motors for an electronically driven one, in so doing drilling holes in the shaft's wall to install bolts. *Id.* at 437. Prior to the conclusion of the tenancy, the tenants removed the elevator and all accompanying apparatuses, "without injury to the building other than the holes in the shaft caused by the withdrawal of the bolts." *Id.* The lease required the lessee to obtain permission of the lessor before making "substantial alterations" and stated that such approved improvements would remain the property of the lessor. *Id.* at 440. The Supreme Court of Maryland held that the elevator was a trade fixture, reasoning that since the building had an elevator shaft, the landlord should have contemplated that a tenant would put that shaft to use by installing an elevator, and that the installation of the elevator did not cause substantial damage to the building, as the holes could easily be filled, and the tenant installed the elevator to "better enjoy the use of the leased premises in the management and conduct of his business." *Id.* at 440–42. As such, the Supreme Court of Maryland held the elevator was a trade fixture, and the installation of such a trade fixture was not such an alteration or improvement that would become property of the landlord at the expiration of the lease. *Id.* at 440.

This precedent buttresses our holding that the installations and improvements made by Urge remained trade fixtures and thus Urge's property, but it is also instructive in demonstrating the strict interpretation of such contractual provisions so that "trade fixtures" remain the property of the tenant.

23

in *Cabana* that the tenant's leaving the building on the property after defaulting on its obligation to pay rent forfeited the building to the landlord. *Id.*

In our view, the facts of this case are easily distinguishable from *Cabana*. In *Cabana*, this Court held that the lease term was not terminated during the court action finding the tenant in default. 61 Md. App. at 616. Instead, we noted that the lease term ended, and the tenant no longer had rights in the leased premises, nor the property left upon it, after the tenant failed to cure its breach within 10 days of notice thereof *and* the landlord changed the locks on the building. *Id.* at 616–17. Unlike in *Cabana*, EBC did not repossess the land upon Urge's default but instead permitted Urge to remain on the premises until the end of the Lease term. EBC's management even instructed its security personnel, upon learning that Urge was removing its installations, to do nothing, as "they had every right to stay until the end of the Lease month." Further, unlike in *Cabana*, Urge's trade fixtures did not remain on the premises after the lease term ended and thus could not rightfully be treated as abandoned and surrendered to the landlord, as the common law regarding trade fixtures dictates.

We find no legal error with the circuit court's interpretation of the Lease provisions and the relevant Maryland statutes and common law. We hold that the circuit court correctly concluded that ownership of the trade fixtures did not immediately transfer to

EBC upon Urge's default.[10]  Accordingly, barring EBC exercising its rights to detain such property upon default, Urge did not commit further breach by removing its trade fixtures.

## III.    The Circuit Court Erred in Finding That Urge Was Not Liable to EBC for the Costs to Restore the Premises to the Condition Required in the Lease.

Both the common law regarding trade fixtures and the terms of the contract required Urge to repair the damage to the Premises caused by the installation and removal of its trade fixtures, and to do so by the end of the lease's term.  EBC claimed that Urge's surrender of the property in a state of disrepair constituted breach of the terms of the Lease. As such, Urge should be liable for damages related to the cost of such repairs, as well as for related attorney's fees.  Urge counters that EBC frustrated Urge's ability to fulfill its contractual obligation to make these repairs when EBC locked Urge out of the Premises following the removal of the trade fixtures.  As such, any breach by Urge regarding repairs should be excused.

Evidence of a breach exists when a plaintiff can show that the defendant owed a contractual duty to the plaintiff, and the defendant failed to perform that obligation. *WSC/2005 LLC v. Trio Venture Assocs.*, 460 Md. 244, 265 (2018).  However, a party may also commit breach by preventing another party to the contract from performing its duties, or by failing to cooperate when such cooperation is implied for both parties to perform and

---

[10] Regarding EBC's conversion claims, conversion, "at a minimum" requires the defendant to "exercise dominion or control over" property that is "inconsistent with the plaintiff's rights" in that property.  *Darcars Motors of Silver Spring, Inc. v. Borzym*, 379 Md 249, 262 (2004) (quoting *Keys v. Chrysler Credit Grp.*, 303 Md. 397, 414 (1985)). Because EBC did not have ownership rights in the trade fixtures before or after Urge's default, as we explain *supra*, conversion is not a viable theory of liability.

25

enjoy the benefit of the bargain. *Livingston v. Green Props., Inc.*, 222 Md. 354, 357 (1960); *see also WSC/2005* LLC, *supra*, 460 Md. at 267 ("[T]he prevention doctrine applies when one party prevents another party from performing under the contract.").

Section 14(A) of the Lease clearly required Urge, as Tenant, to surrender the Premises "in good order, condition and repair." Section 14(B) extends this obligation, requiring Urge to surrender the Premises "broom clean, and in good order and condition," with all Tenant's Property (including trade fixtures) having been removed, and with the Tenant repairing all damage and restoring the "Premises to the condition in which they were in prior to the installation of the articles so removed, ordinary wear and tear and acts of God and casualty damage excepted, *prior to the Termination Date*." The Termination Date was September 30, 2019, the last day of the Lease's term.

Thus, by the express provisions of the Lease, Urge's repairs were to have been completed by September 30, 2019. *See Landaverde*, *supra*, 238 Md. App. at 243–44 (holding court must give effect to plain, ordinary meaning of unambiguous contract terms and interpret contract as a whole). The parties made no allowance for a "reasonable time thereafter" or any similar cushion for Urge to both remove its trade fixtures and then return the Premises to the state Urge found it in at the commencement of the Lease in 2006, normal wear and tear excused. Such an interpretation of the contract further squares with the common law of trade fixtures explored above, in which a trade fixture must not cause "serious injury" to the land upon its removal. *See Hartge Yacht Yard, Inc.*, *supra*, 379 Md. at 465.

26

We struggle to decipher the evidence as to whether and how Urge may have been frustrated in completing its contractual obligations. Mr. Lopez Geron testified that Urge had every intention of returning to the Premises after removing the trade fixtures and completing all required repairs. Nevertheless, EBC thwarted this effort by having security personnel block Urge's access to the Premises. EBC's security manager testified that he was instructed not to interfere with Urge's comings and goings from the Premises, even after EBC thought Urge was violating the Lease by removing trade fixtures despite its default. Based on this apparently conflicting testimony, it is unclear when and to what extent Urge was frustrated from fulfilling its obligation to repair damages and return the Premises to its prior state.[11]

We find insufficient clarity in the trial court's ruling on this issue to allow us to evaluate the court's legal or factual accuracy or error in concluding that EBC frustrated Urge's ability to repair the Premises, and that this relieved Urge from this obligation and the resultant damages. Accordingly, we remand this issue to the circuit court to determine whether Urge breached the duty to return the Premises to its condition prior to the commencement of the Lease, and, therein, whether EBC frustrated Urge's performance of

---

[11] EBC argues in its brief that Sections 14 and 15's requirements that Urge remove its property and repair the Premises to its prior state do not necessarily mean that Urge was entitled to make such repairs itself, and thus there was no requirement for EBC to permit Urge to make such repairs, therefore there was no frustration in contractual performance, even if Urge was locked out. We make no explicit ruling on this argument and only acknowledge that as much as the Lease may not explicitly require Urge to perform the repair work, the Lease also does not forbid Urge from doing such work. Indeed, the only clear obligation is that the work be completed by the Termination Date.

this obligation, thereby relieving Urge of liability for damages regarding repairs. Our remand is without affirmance or reversal of the circuit court's initial ruling on this specific issue. We return the issue to that court for further proceedings so that it may better articulate clear factual findings and tie those findings to relevant law that cogently explains the court's ruling on Urge's liability, or lack thereof, regarding damages due to its failure to repair and restore the Premises.

In its oral ruling from the bench, the circuit court pronounced that "the landlord essentially stopped Urge from removing anything and prevented them, as the [c]ourt sees it, from putting the property" back to its prior state. In response to EBC's protests, the circuit court noted that EBC "stopped [Urge] from doing what they were doing . . . they were stopped from doing the work they were doing to move away. . . The [c]ourt finds they weren't permitted to do and they were basically stopped from removing items from the property." The circuit court's ruling seemed to conflate efforts to prevent Urge from removing property with efforts to prevent Urge from making repairs. Previously in its ruling, the court seemed to endorse the idea that EBC was within its right to lock Urge out of the Premises, saying EBC could prevent Urge from removing property "given that the lease said that these kinds of fixtures could not be removed if there was breach."

The circuit court proceeded to invite this Court to return this matter to it, lamenting EBC's likely exasperation in the face of the circuit court absolving Urge of its requirement to make repairs, and conceding, "I guess I will leave it at this. And someone else, some higher authority if you choose to pursue that will tell me if I am wrong. . . [T]he [c]ourt finds it doesn't even have the wherewithal to say, yes, they should have done that."

28

Though the trial court ruled EBC frustrated, and thus absolved, Urge's duty to repair, we are unable to locate competent evidence within the record, beyond the court's conclusory declaration that such frustration occurred. As such, we cannot say whether competent evidence existed to support the circuit court's ruling. *See Spaw, LLC, supra*, 452 Md. at 339.

It is well settled that if we "conclude[ ] that the substantial merits of a case will not be determined by affirming, reversing or modifying the judgment, or that justice will be served by permitting further proceedings, the Court may remand the case to a lower court," and in so doing we will "state the purpose for the remand." Md. Rule 8-604(d); *see Shapiro v. Greenfield*, 136 Md. App. 1, 18 (2000) (holding this Court was "unable to review the factual underpinnings of the trial court's conclusion," thus, "[u]nder the circumstances we will remand for reconsideration"). This Court may order a "limited remand so that the circuit court can, based on the evidentiary record already before the court, conduct further proceedings and render further factual findings under the appropriate theories of liability discussed in [this Court's] opinion." *Qun Lin v. Cruz*, 247 Md. App. 606, 642 (2020); *see also Thompson v. State*, 139 Md. App. 501, 537 (2001) (remanding a discrete issue in the opinion "to the trial judge in order to provide him with an opportunity to clarify" his ruling).

Accordingly, we remand the issue of damages regarding Urge's failure to return the Premises to "to the condition in which they were in prior to the installation of the articles removed . . . with the Premises in good order, condition, and repair," ordinary wear and tear excepted. Upon remand, the trial court shall determine whether and when EBC

prevented Urge from re-entering the Premises and making repairs that would restore the Premises to its original condition.

We leave to the discretion of the trial court, upon remand, to review the evidence presented and to decide whether additional testimony or argument is needed on the issues of frustration of contractual performance and, lacking such frustration, damages related to the repair of the Premises. In reconsidering its findings, if the circuit court determines EBC prevented Urge from entering the property to make such repairs prior to the end of the term, then that court must further determine if this action constitutes frustration thereby alleviating Urge from some or all liability for damages. Such damages apply *only to repairs to the Premises*, and not to any Tenant Property or improvements still left on the Premises and considered abandoned.[12] We, therefore, direct the trial court to make clear findings of fact following remand regarding whether Urge is liable to EBC for costs to restore the Premises to the condition required by the Lease.

Additionally, we note that this dispute began with Urge seeking declaratory judgment regarding its exterior trade fixtures, primarily the walk-in coolers attached to the building. Nonetheless, the circuit court failed to enter such judgment in the record. *Md. Dep't of St. Police v. Dashiell*, 443 Md. 435, 449 (2015) ("[W]hether a declaratory judgment action is decided for or against the plaintiff, there should be a declaration in the

---

[12] As established above, the exterior walk-in coolers installed by Urge and left at the Premises are trade fixtures, but because they remain on the Premises following Urge's default and the termination of the lease, they are considered abandoned. As such, Urge is not liable for such damage to the exterior walk-in coolers, regardless of the trial court's ultimate ruling regarding EBC's potential frustration of Urge's duty to repair the Premises.

judgment or decree defining the rights of the parties under the issues made.") (quoting *Case v. Comptroller*, 219 Md. 282, 288 (1959)). The circuit court erred by not clearly resolving the declaratory judgment issue and entering "in a separate document, state[d] in writing[,] its declaration of the rights of the parties, along with any other order that is intended to be part of the judgment." *Aleti v. Metro. Balt.*, LLC, 251 Md. App. 482, 519–20, *cert. granted* 476 Md. 263(2021), and *aff'd* 479 Md. 696 (2022) (quoting *Bowen v. City of Annapolis*, 402 Md. 587, 608 (2007)).

Notably, "[t]his error is procedural at worst, however, and not jurisdictional. . . . 'This Court may, in its discretion, review the merits of the controversy and remand for the entry of an appropriate declaratory judgment by the circuit court.'" *Balt. Cnty. v. Balt. Cnty. Fraternal Ord. of Police Lodge No. 4*, 439 Md. 547, 566 (2014) (quoting *Bowen v. City of Annapolis*, 402 Md. 587, 609 (2007)); *see also Point's Reach Condo. Council of Unit Owners v. Point Homeowners Ass'n, Inc.*, 213 Md. App. 222, 228-29 (2013) ("[T]he trial court's procedural error in not memorializing its decision in writing, after announcing it in detail on the record, does not preclude our review of the issues, was harmless, and can be corrected on remand without reversing the judgment."). Accordingly, because we vacate the circuit court's ruling regarding Urge's duty to repair the Premises, we include in our mandate instructions that the circuit court shall issue a such a written declaration.

Accordingly, we affirm the circuit court's findings as to the first two questions presented, but we remand to the trial court for further proceedings, in accordance with this opinion, on the third question regarding damages for Urge's failure to repair the Premises.

Additionally, on remand, the circuit court shall issue a written declaration of the parties'

rights and obligations, consistent with this opinion.

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS AFFIRMED AS TO ISSUES I AND II. COSTS TO BE PAID BY APPELLANT. JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY IS VACATED AS TO ISSUE III. THE CASE IS REMANDED TO THAT COURT FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION REGARDING WHETHER URGE IS LIABLE TO EBC FOR THE COSTS TO RESTORE THE PREMISES TO THE CONDITION REQUIRED IN THE LEASE. COSTS TO BE SPLIT EQUALLY BETWEEN APPELLANT AND APPELLEE. ADDITIONALLY, THE CASE IS REMANDED TO THAT COURT TO ENTER A WRITTEN DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION.**